## N. S. EASTON ET AL. V. J. M. DUDLEY.

### No. 2876.

1. **Railway Station Agents—Freight Contracts.**—Station agents are presumed to have authority to make contracts for the transportation of freight, and in the absence of any adequate notice to the public of any limitation upon their authority in that respect the railway company will be bound thereby, both as to the rates and as to the expedition of transportation and delivery. Wood's Railway Law, p. 450.

2. **Same.** — A contract by a railway station agent with a shipper for a given number of stock cars at a stated time and place held to bind the corporation.

3. **Excessive Judgment—Facts.**—See analysis of testimony held insufficient to sustain the judgment.

APPEAL from Ellis. Tried below before Hon. Anson Rainey.

The following statement accompanies the opinion:

This suit was brought by appellee J. M. Dudley against appellants N. S. Easton, Charles Dillingham, and James Rintoul, receivers of the Houston & Texas Central Railway Company, alleging that J. T. Bell, agent of appellants at Ennis, on June 22, 1888, agreed with plaintiff to furnish him six cars for shipment of 131 cattle on the next day at 2 p. m., plaintiff agreeing to deliver the same at defendants' stock pens at the time mentioned, the cattle to be shipped by defendants to Chicago; that plaintiff delivered the cattle at the time and place agreed on and demanded the cars; that defendants failed to furnish the cars at the time stipulated and to ship the same, and delayed the shipment until the 24th day of June, 1888. That they failed to deliver the cattle in Chicago with reasonable speed and care; that they handled the same in a rough and reckless manner, causing them to bruise each other. That in consequence of the delay the market value of the cattle declined and additional expenses were incurred by plaintiff, to his damage $1212.43. That the cattle should have arrived at Chicago on the 27th of June, but did not arrive there until the 29th, during which time the market value of the cattle declined 50 cents per hundred weight.

The petition contained the following allegation: That said cattle weighed 134,770 pounds, worth in Chicago on the 27th of June $2.85 per hundred weight; that by reason of the delay the cattle wasted 6550 pounds, worth $186; that plaintiff was compelled to pay for one extra feed, worth $20. He also claimed damages for extra time and trouble.

Defendants pleaded general denial, fraud upon the jurisdiction of the court, and that the cars were delivered in a reasonable time.

A jury was waived and the court gave plaintiff judgment for $660.40.

Plaintiff proved his contract as alleged and its breach; that had the cars been delivered on the 23rd of June as agreed the cattle would have arrived in eighty hours at Chicago, but that they arrived on the 29th; that the decline in the market value of such cattle was 15 cents per hundred weight from the 27th to the 28th, and the same from the 28th to the 29th of June. He also proved by his own testimony that the cattle were roughly handled while in possession of defendants, in that beds were not furnished for them, which caused them to slip down and hook each other, one of them being killed in the cars on the road.

Plaintiff also testified as follows: " I did not weigh the cattle, but would judge they weighed about 1250 pounds a head, and that they lost in weight from 80 to 150 pounds apiece; they were grass-fed cattle, and would naturally lose about 80 pounds per head in shipping." ·It was proved that they weighed in Chicago 134,770 pounds. It was also proved that cattle would deteriorate in value by being one day longer on the road than usual in shipping.

Defendants proved by their agent Bell that he did not agree to furnish the cars certainly on the 23rd, but that he would do so if possible; that he telegraphed to Corsicana, a terminus of a section of the road, for the cars on the same day they were demanded, and received a reply that they would be sent the next day if possible, and he so agreed with plaintiff. The distance from Ennis to Corsicana is twenty miles, over which line there were two trains a day. Idle cars were kept at Corsicana. Bell also testified that he had no authority to make special contracts as to delivery of cars. He was the local agent for the company at Ennis, and had been agent for the company for about twenty years.

*Frost & Etheredge,* for appellants.— 1. Where a special contract with an agent which extends the liability of the principal beyond that imposed by law is relied on, the authority of the agent must be shown before such contract can be established. Rev. Stats., art. 4227a; Hutch. on Car., sec. 267.

2. The judgment is not sustained by the testimony. [See opinion.]

*Groce & Tempelton,* for appellee.— 1. Appellants are bound by the contracts of their agents, within the apparent scope of the authority of such agents, in favor of persons without knowledge of any limitations upon such authority.

2. It was competent for appellants through their agent to contract to furnish appellee cars at a specified time, and for beach of a contract so made they would be responsible in damages; and to a contract so made Acts 1887, p. 133, has no application. Railway v. Nicholson, 61 Texas, 491.

3. The proof shows that the time agreed upon between appellee and the agent Bell for the delivery of the cars ordered was reasonable under the circumstances.

COLLARD, Judge.—It is insisted by the appellants that J. T. Bell, station agent at Ennis, and who had been agent of the company for whom the receivers were in charge of the road for twenty years, had no authority to make the special contract with appellee, the plaintiff below, to furnish him the cars for shipment of his cattle on the day specified. The agent testified that he had no authority to make such special contracts. He says that he did agree with plaintiff to furnish him the necessary cars for the shipment of the cattle, and that they were to be furnished on the next day after the contract was made if possible. He assumed to have authority to make the contract, and did make, according to his testimony, a contract to furnish the cars required on the next day if possible. He was the station agent and apparently had all necessary authority to carry on the company's business at the station.

It is said that "such agents (station agents) are presumed to have authority to make contracts for the transportation of freight, and in the absence of any adequate notice to the public of any limitations upon their authority in that respect the corporation will be bound thereby, both as to rates and as to expedition of transportation and delivery." 1 Wood's Ry. Law., sec. 165.

It was held, however, in Wood v. Railway, 59 Iowa, 196, that the authority of a station agent to furnish cars at a particular time and place was a question of fact and not of law for the courts; and that the courts could not say as a matter of law that station agents must possess the power to make such contracts, nor could the courts take judicial notice that such agents possess such power, or are held out to the world as possessing it. Justice Beck dissented from the opinion of the majority of the court, supporting his view with what seems to us the better reasons. It is well known that such contracts are frequently made by railway companies and that they recognize such authority in the agents. Some person must be at shipping stations to give information, to contract with reference to the shipping of freight, and why not as to the time when cars will be furnished as well as any other matter relating to the business? Why except the time when the freight will be received and the cars furnished, when other incidents of the shipment not more important are subjects of contract by the agent?

Upon application for cars made in writing, under our law, it is the duty of the company to supply the cars in a reasonable time, not to exceed six days from the receipt of the application. Gen. Laws 1887, p. 133. The company on such application being made, having no contract with the shipper, would be allowed a reasonable time not to exceed the time given

by the statute in which to furnish the cars. The company or its agent through whom it contracts would not be bound to contract to furnish cars except it might be in reasonable time within the six days, but the law does not prohibit a contract.

There must be a contract as to the time when the freight will be received, otherwise a shipper would never know when to deliver such freight as could be received only on the cars. Such contracts are made daily, and must be made by some one. The question is, who is to make the contract for the company? Naturally the station agent. He is there to represent the company, and does represent it, otherwise the shipper would be compelled to find some general officer clothed with the necessary power, who in most cases would be many miles away from the station. It is the duty of the company to have some one on the ground to represent it in this respect. It can not be expected that the company should have a general officer at each station for this purpose—this would be oppressive; and it would be equally oppressive upon the shipper to require him to make such contracts as must be made with some general officer of the company. The time when the cars are to be ready is of the utmost importance in the shipment of many articles, especially livestock. Such business must of necessity be transacted by the company's agent, and in fact it is so done because it is a necessity. If the agent can contract to receive the freight, he can contract as to the time when he will receive it and as to every other undertaking necessary to that end.

The time for the delivery of the cars in this case was not unreasonable. It was only twenty miles from Ennis to Corsicana where idle cars were kept, it being a terminus of a section; two trains passed between the two places daily, and no reason or excuse for the delay is offered by defendant. Bell, the agent, says that when plaintiff applied for the cars he telegraphed to Corsicana for the cars, received a reply that they would be sent next day if possible, and so contracted, but defendants do not show that any effort at all was made to comply with the undertaking. The court's finding of fact that the contract as alleged by plaintiff was made can not be disturbed according to well established rules.

Appellants complain by assignment of error that the judgment is excessive and unsupported by the evidence. The petition claimed that the price declined in the Chicago market for such cattle as his from the 27th, when the cattle should have arrived, to the 29th of June, 1888, when they did arrive, 50 cents per hundred weight; that they wasted 6550 pounds en route by delay and rough handling, worth $186.67; extra feed, $20; extra time and trouble, $50.

There was no evidence at all of any extra feed or of any extra time and trouble. There was evidence of the waste in the weight of the cattle while on the road—not as much as is claimed in the petition. But suppose it was $186.67 as claimed. There is nothing to be added to this amount

but the decline in the market at Chicago.    We have some doubt that the evidence was sufficient to show that there was a day's unreasonable delay on the road after the cattle were put on the cars, but it may be admitted there was such delay; so that there would be two days' delay in all, including the day lost by the failure of defendants to furnish the cars as agreed.    Now the only evidence as to the decline in the market at Chicago during these two days from the 27th to the 29th of June, 1888, is that of E. E. Brown, resident of Cook County, Illinois, who was in the livestock commission business and who sold these cattle for plaintiff in Chicago. His evidence was by deposition taken by defendants.    On his direct examination he said he sold for plaintiff 131 head of cattle weighing 134,770 pounds in Chicago on the 29th of June, 1888, at $2.45 per hundred weight, their full market value on that day.    "I am familiar with the market price in Chicago.    On the 27th day on June, 1888, the said cattle would have sold on said market for $2.60 per hundred weight."    This makes the decline only 15 cents per hundred weight, in all on the 134,770 pounds $202.15.    This added to the $186.67 would make $388.82.    The amount found by the court was $660.40.

On cross-examination this same witness testified:    "Said cattle would have brought on the 27th of June, 1888, at Chicago $2.85 per hundred weight, and on the 28th they would have brought $2.60 per hundred, and on the 29th $2.45."

There is no explanation attempted to be made of this discrepancy in the witness's testimony; it was taken by deposition, and of course he could not explain.    With both statements standing before us it is impossible for us to know what the witness meant or what the proof was.    If the decline in the market should be according to his last statement, 40 cents per hundred weight, the total decline on the 134,770 pounds would be $539.08. Then estimating the waste at 4585, as we find it to be on the basis of 35 pounds to the head of cattle according to plaintiff's evidence that the delay occasioned such additional loss on an average, and counting the price of the loss at $2.65 per hundred pounds, the loss will be $121.58, which will make $660.58 in all, almost the exact amount ascertained to be due by the court.    But as stated before we are at a loss to know what the proof shows the decline was from the 27th to the 29th of June.    There being so much confusion and uncertainty in the evidence on this point, we are of opinion the judgment of the lower court should be reversed.

The evidence is no guide to the truth.    Had the contradictory statements been made by two witnesses, one contradicting the other, the rule that there exists evidence to support the finding of the court would apply; but these statements are made by the same witness, which make his testimony at least of little value, not enough to justify a reliable conclusion.

The petition contained the following allegation:    "That said cattle weighed 134,770 pounds, worth in Chicago on the 27th of June $2.85 per

hundred weight; that by reason of the delay the cattle wasted 6550 pounds, worth $186," etc.

It was proved on the trial that the cattle did weigh in Chicago when sold 134,770 pounds. Appellants argue that the proof shows that the cattle weighed as much as they were alleged to weigh, and therefore there could be no claim for loss of weight. The allegation fails to show when and where the cattle weighed 134,770 pounds, when shipped or in Chicago. The allegation, with all the aid it can receive from other parts of the petition, is too ambiguous to enable us to say positively and certainly what it means. It was inaccurate and negligent pleading. Our conclusion is the judgment should be reversed and the cause remanded.

*Reversed and remanded.*

Adopted October 21, 1890.