MODERN WOODMEN OF AMERICA v. ATCHESON. (No. 9182.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 6, 1919. Rehearing Denied Jan. 24, 1920.)

1. INSURANCE 819(2)—EVIDENCE HELD TO SHOW MISREPRESENTATIONS AS TO INSURED'S HEALTH.

In action on benefit certificate involving the issue of whether insured misrepresented the condition of his health in application for membership, evidence *held* insufficient to support judgment for beneficiary.

2. APPEAL AND ERROR 1008(2)—FINDING NOT DISTURBED WHERE SUPPORTED BY REASONABLY SUFFICIENT EVIDENCE.

Finding of court when jury is waived will not be disturbed if there is competent and clear and satisfactory evidence reasonably sufficient to admit of such finding.

3. APPEAL AND ERROR 931(1)—REASONABLE PRESUMPTIONS TO BE INDULGED IN FAVOR OF JUDGMENT.

Appellate court in passing upon the sufficiency of the evidence to support verdict or finding will give due weight to the testimony tending to support the judgment, and indulge all reasonable presumptions in favor of the judgment.

4. EVIDENCE 597—TESTIMONY RAISING MERE SUSPICION INSUFFICIENT TO SUSTAIN FINDING.

Testimony that raises a mere suspicion or surmise of the existence of a fact sought to be established in legal contemplation falls short of being sufficient to sustain an affirmative finding by the trial court or jury that such fact existed.

---

For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

5. INSURANCE ⬳723(2)—STATUTE MAKING POLICY VOID FOR MATERIAL MISREPRESENTATIONS INAPPLICABLE TO FRATERNAL BENEFIT SOCIETIES.

Vernon's Sayles' Ann. Civ. St. 1914, art. 4947, providing that misrepresentation in application shall not constitute any defense to suit on policy unless it was material to the risk, or actually contributed to the contingency or event on which the' policy became due and payable, has no application to contracts of insurance made by fraternal benefit societies as defined in article 4827, in view of article 4830.

6. INSURANCE ⬳255, 723(2)—REPRESENTATIONS WARRANTED TRUE WILL AVOID POLICY IRRESPECTIVE OF MATERIALITY.

In the absence of statute to the contrary, false representations in an application for insurance which the applicant warrants to be true will avoid the policy without reference to the materiality of such statements.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by Millie May Atcheson against the Modern Woodmen of America. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Pat M. Neff, of Waco, for appellant.

McMurray & Gettys and Ratliff & Spencer, all of Decatur, for appellee.

BUCK, J. This is an action brought by Millie May Atcheson against the Modern Woodmen of America, a fraternal beneficiary society, to collect $3,000 under a benefit certificate issued by said society on the application of plaintiff's deceased husband, Otis James Atcheson. From a judgment for full amount of the policy in favor of plaintiff, the defendant has appealed.

Plaintiff alleged that the defendant was a fraternal beneficiary society incorporated in the state of Illinois and licensed to do business in the state of Texas; that on the 8th day of February, 1917, defendant issued, and on the 16th day of February thereafter defendant delivered to her husband, Otis James Atcheson, a benefit certificate for $3,000, payable to her on the death of the insured, that insured died on the 20th day of July, 1917, and that in all respects he complied with the conditions and provisions of said certificate; that defendant had refused payment of said certificate; wherefore she prayed judgment.

Defendant answered by way of a general demurrer, a general denial, and two affirmative defenses: First, that it was a fraternal beneficiary society, as alleged by plaintiff, and that plaintiff's alleged cause of action was founded on a contract alleged to have been entered into between the insured and the defendant, which said alleged contract consisted of the by-laws of defendant, the application of said insured for membership therein, and the benefit certificate issued on said application; that on January 20, 1917, the insured executed and delivered a written application for membership in the defendant society, and that said application contained certain statements by the insured and answers to questions propounded touching the insured's condition of health during the seven years prior to the application, and as to whether or not he had had certain diseases, and whether or not he had been treated by physicians therefor during said time, and asking for the names of said physicians and time and place of treatment, etc. The defendant further alleged that the answers to certain questions propounded, hereinafter set out, were untrue, and that said answers, by the terms of the contract between the insured and the defendant, constituted warranties, and that their falsity rendered any policy issued null and void. Defendant further answered that by its by-laws it was provided that liability of the society for the payment of the benefits upon the death of the beneficiary member should not begin until the applicant had been duly recommended by the camp physician and his application approved by the state medical director and the Supreme Medical Directors, nor until the applicant had taken the obligations prescribed in the ritual, and not until a benefit certificate had been issued and signed by the applicant and delivered manually in person by the clerk of the camp to the applicant while said applicant was in good health; that no officer of the society, except as provided in section 108 of the by-laws, nor any local member or officer or any member thereof, was authorized or permitted to waive any provisions of the by-laws of the society which relate to the contract between the member and the society. Neither should any knowledge or information obtained by nor notice to any local camp or officer or member thereof, or by or to any other person, be held or construed to be knowledge of or notice to the Head Camp, or the officers thereof, until after said information or notice be presented in writing to the Head Clerk of the society; that it was specially provided in said by-laws:

"No local camp or any of its officers thereof shall have the right or power to waive any of the provisions of the by-laws of this society."

The application made and signed by the insured contained, among other things, the following agreement:

"I have read and hereby accept the above benefit certificate and agree to all the conditions therein contained and referred to.

"I hereby warrant I am in good health. I agree and understand that this certificate is not binding upon the society until signed by me nor unless I am now in good health.

"[Signed]   Otis James Atcheson.

"A copy of your application for membership

is included in or attached to this certificate. Read it. If any answer or statement therein is not correct, notify the Head Clerk at once."

The application, as signed by the insured, contained the following questions and answers thereto:

"16a. Have you, within the last seven years, consulted or been treated by any physician or physicians or other person in regard to personal ailment? Yes.

"b. If so, give name and address of each and all physicians or persons consulted or by whom treated, and dates, ailments, and duration of attacks. Two weeks; D. Y. Stem, Slidell; rheumatism.

"c. Was recovery complete? Yes."

"17a. Have you ever changed climates or occupation for benefit of health? No."

"18a. Do you abstain entirely from the use of intoxicating liquors? No.

"b. How long have you been a total abstainer? One year.

"c. Were you ever intoxicated? Yes.

"d. If so, when last? December 24, 1915."

"23a. Have you been an inmate of any infirmary, sanitarium, retreat, asylum, or hospital? Yes.

"b. If so, where? Ft. Worth.

"c. When? 1913.

"d. Duration? 3 days.

"e. For what cause? Eye.

"f. Was recovery complete? Yes.

"g. Give name and address of attending physicians. Boyd & Hood, Ft. Worth, Tex."

"26a. Have you ever had inflamed or swollen joints from rheumatism? Yes.

"b. If so, give number, dates, duration of attacks, and parts affected. One, three years ago.

"c. Were they accompanied by cough, shortness of breath, pain in chest, or palpitation of the heart? No."

"33. Have you ever had, or has any physician ever treated you for, or advised or informed you that you ever had * * * rheumatism * * * or any disease of the heart * * *? No."

Defendant alleged that said answers, and each of them, were false and incomplete and not literally true, and alleges the fact to be that within seven years preceding said application for membership the said Otis James Atcheson had consulted and had been treated by other physicians than Dr. D. Y. Stem, of Slidell, for two weeks for rheumatism; that in the year 1914 the said Atcheson was treated by the said Dr. D. Y. Stem from the month of April, 1914, until the month of June, 1914, for a severe attack of rheumatism and heart disease; that during the same time the said Otis James Atcheson also consulted and was treated by Dr. J. M. Inge for rheumatism and heart disease in the month of March, 1916; that the said Otis James Atcheson also consulted and was treated by Dr. D. Y. Stem for rheumatism and heart disease in the month of December, 1916; that the said Otis James Atcheson had numerous attacks of rheumatism, accompanied by cough, shortness of breath, pain in the chest, and palpitation of the heart; that he never fully recovered from any of said attacks, but had chronic heart disease and recurrent attacks of rheumatism; that in the month of March, 1916, the said Otis James Atcheson was an inmate of a sanitarium at Denton, Tex., for treatment for rheumatism and heart disease; that the said Otis James Atcheson was not a total abstainer from the use of intoxicating liquors for one year prior to his application for membership, and that the said Otis James Atcheson was not of sound body and health and free from disease or injury at the time of said application for membership in the defendant society.

Plaintiff filed a supplemental petition in reply to defendant's answer, consisting of a general denial and a plea that, if the application was untrue or misleading in any respect, said application was formulated by the defendant and the answers complained of as not correctly stating his physical condition or concerning any disease or diseases that he may have had merely called for an answer giving the judgment or opinion of the applicant and were not embraced in any warranty; that there was not room in the application sufficient to write the answers any more elaborately than they were written; that the insured stated all the facts in full and in detail to the physician who was making the examination, and that said physician wrote the answers as fully as the space provided for same would permit, and, if the answers were not full and explicit, the same was caused by the fraudulent design of the defendant in not providing more space for the answers to be written in said application; that, if Dr. Inge ever had anything to do with treating the insured, "it was merely in conjunction with the treatment given by Dr. Stem and during the same time, so that the treatment of the one was the treatment of the other"; "that, if anything was ever the matter with said insured's heart, it was nothing more than the rheumatism extending thereto, which rheumatism said insured reported in said application; * * * that all of said answers and statements made by said insured were made in good faith, with full belief in their completeness and correctness." To this reply to defendant's answer the defendant interposed its special exception, which was by the court overruled.

[1, 2] We have carefully examined the statement of facts, consisting of some 98 pages, and have been forced to the conclusion that the evidence, taken as a whole, is insufficient to support the judgment and the evident conclusions by the trial court, and therefore that the judgment rendered should not be allowed to stand. While the verdict of the jury, or the finding of the court, when a jury is waived, as here, will not be disturbed if there is competent evidence to support it, this rule is to be understood in the sense that the evidence is reasonably sufficient to admit of such finding. Chandler v. Meckling, 22 Tex.

36; Mo. Pac. Ry. Co. v. Somers, 78 Tex. 439, 14 S. W. 779; Railway Co. v. Eckols, 7 Tex. Civ. App. 429, 26 S. W. 1117.

[3] While an appellate court will not reverse a judgment merely because it may appear from the record that the evidence preponderates in favor of the losing party or against the findings of facts of the trial court (Raysor v. Reid, 55 Tex. 266; Barnard v. Tarleton, 57 Tex. 402; Bird v. Pace, 26 Tex. 488; Clarendon Land Co. v. McClelland Bros., 86 Tex. 179, 23 S. W. 576, 1100, 22 L. R. A. 105), yet it is the duty of a court of appeal, when the question of the sufficiency vel non of the evidence to support the verdict or the finding is properly presented to the court, to determine, after giving due weight to the testimony tending to support the judgment and indulging in all reasonable presumptions in favor of the judgment, to decide whether or not such evidence is clear and satisfactory. Bright v. Briscoe, 202 S. W. 183, 187.

[4] Testimony that raises a mere surmise or suspicion of the existence of a fact sought to be established in legal contemplation falls short of being sufficient to sustain an affirmative finding by trial court or jury that such fact existed. De Shazo v. Eubank, 191 S. W. 369; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, and cases therein cited. In Hyatt v. Johnston, 91 Pa. 200, and cited with approval in Joske v. Irvine, supra, it is said:

"Since the scintilla doctrine has been exploded both in England and in this country, the preliminary question of law for the court is, not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. If there is evidence from which the jury can properly find the questions for the party on whom the burden of proof rests, it should be submitted; if not, it should be withdrawn from the jury."

See T. & P. Ry. Co. v. Lucas, 190 S. W. 800.

There must be "evidence sufficient to warrant a reasonable belief of the existence of the fact which is sought to be inferred." Washington v. Railway Co., 90 Tex. 314, 38 S. W. 764; Canode v. Sewell, 182 S. W. 421; Railway Co. v. Walker, 38 Tex. Civ. App. 76, 85 S. W. 28; Lans v. Bristow, 188 S. W. 970.

[5] It appears from the authorities that article 4947, V. S. Tex. Civ. Stats. (which provides, in effect, that any misrepresentations or false statements made in the application for an insurance policy shall not constitute any defense to any suit brought upon the insurance contract unless it be shown that the thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable), has no application to contracts of insurance made by fraternal benefit societies, as defined in article 4827 of the Statutes. Modern Order of Prætorians v. Hollmig, 100 Tex. 623, 103 S. W. 476; article 4830, V. S.

Civ. Stats.; Modern Woodmen of America v. Owens, 60 Tex. Civ. App. 398, 130 S. W. 858. The by-laws of the defendant society provided that the application and the statements and answers therein should be held to be strict warranties and to form the only basis of liability of the society to such member and to his beneficiary, and that, if said application be not literally true in each and every part thereof, then the benefit certificate should be absolutely null and void. It follows that, if the answers made by the insured to the question propounded by the society were not literally or even substantially true, or did not disclose the true condition of the insured's health at the time of the application, and did not disclose the facts with reference to his condition of health and his treatment by physicians, etc., during the seven years prior to the application, the plaintiff in this suit is not entitled to recover the amount of the policy, but only the assessments or premiums paid by the insured, which latter amount was tendered into court, and a charge requested that judgment be rendered only for said amount.

As to the evidence touching the matters inquired about in the questions propounded in the application, and set out above in this opinion, Dr. D. Y. Stem testified for the defendant in substance as follows: That he was a physician of some 30 years' general practice, and had lived at Slidell, where the insured resided some 22 years; that he had 30 years' experience in the practice and treatment of rheumatism and heart trouble; that he knew the insured during his lifetime and had known him since he was a small boy; that he treated him in the year 1914 for rheumatism and heart trouble; that his books showed that during May and up to June 14th of that year he made 58 visits to the insured; that at that time the insured was suffering from organic disease of the heart, that is, that he had leakage of the heart, especially of the mitral valve; that he was suffering from rheumatism, shortness of breath, and palpitation of the heart; that he had treated the insured for this trouble since he was a child, and that his condition in 1914 was such that the valve of his heart had become inflamed, and that the disease at that time was incurable; that his joints were swollen, and that he was absolutely helpless; that he treated him during the years 1915, 1916, and 1917; that he made seven visits to the insured in 1915; that in 1915 and in 1916 he also visited him; that the insured grew rapidly worse during the years 1914, 1915, 1916, until he died in July, 1917; that he could tell that the insured's heart was growing worse during these years by the rapidity of the circulation and dilation of the chambers and orifices of the heart; that he could tell this by the way the blood pulsated through his system, throbbing so that you could see the insured's head in motion from the throbbing and pulsating

of the arteries, due to the cardiac pulse; that insured told the witness that he could feel the pulsation of his heart and was alarmed about his condition; that this rheumatic trouble during these years lowered the vitality of the insured, made him sick. and caused him to have spells during which he was confined to his bed and unable to do any physical labor; that when insured, alarmed as to his condition, asked witness what he thought about it, witness told him that his disease was absolutely incurable; that others besides witness told the insured the same thing; that insured never got well of his rheumatic trouble and his heart affection, and that this trouble was the cause of his death; that he often urged and lectured the insured about the necessity of taking care of himself until it becomes obnoxious to the latter; that he had been the family physician of the family since they moved to Slidell, when the insured was a small boy, with the exception of some 8 years when he (witness) was in west Texas.

Dr. J. M. Inge testified that he had been a practicing physician and surgeon since his graduation in 1874, and had training in .postgraduate schools in Chicago and New York at various times since; that he knew Otis James Atcheson during his lifetime and had known him since his childhood; that he was called at various times during the years 1914, 1915, and 1916 to attend the insured and render him medical assistance; that his first visit to the insured was during the year 1914 and continued up to July, 1917; that he was called in consultation with Dr. Stem in 1914, and visited the insured some three or four times during that sick spell; that insured called at the office of witness in Denton a number of times during the year 1914 and occasionally during the year 1916; that his first visit to insured at his home was on April 29, 1914, and that he treated him during another spell in November of the same year; that on November 16, 1914, the insured came to Denton and remained at the sanitarium of the witness until December 3, 1914, during which time the witness treated him; that he came again on March 11, 1916, and remained until March 16, 1916; that on September 3, 1916, he visited him again at his home; that the insured returned again to the sanitarium, and remained there from April 28 to May 25, 1917, after which time he returned home and again took to his. bed, June 26, 1917, and died on July 20, 1917; during insured's last sickness he visited him two or three times, the last time being the 18th of July, 1917; that from his first knowledge of the case in 1914 until insured's death the latter was suffering from rheumatism and heart trouble, the latter being a complication of the former; that the muscles were affected, the patient having high temperature, and the lining of the heart was inflamed, involving the valves; that he had several conversations with insured, advising him to lead a quiet life, with no violent exercise of any kind, and that his habits and diet had much to do with his disease; that he informed insured of the seriousness of his physical condition and told him that he had rheumatism and heart trouble; that insured was not of sound body and health on or before January 20, 1917, the date of the application, nor did he consider, from his intimate knowledge of the case and his treatment of the insured, that the latter could have been of sound health at that time.

Both physicians testified that, while the insured might have been able to do and did do farm work and other labor during the period from 1914 to his death in 1917, at no time was he free from the ailments and symptoms above described, and that violent exercise or hard labor was dangerous to him. Dr. Stem testified that his feelings for the plaintiff were very kindly, and that he had refused to testify in the case until the court threatened to put him in jail and issue attachment for him; that he did not want to testify in the case.

Dr. T. A. Moore testified that he was one of the examining physicians of the local camp of the defendant society, and lived at Greenwood, six miles from Slidell; that he had been practicing medicine some 25 years; that he had known the insured during his lifetime for perhaps 4 to 5 years before his death; that he was called upon in the year 1917 to examine the insured for membership in the Slidell Camp and did examine him; that he asked him questions, examined his heart and lungs, and found his pulse and respiration; that he did not use a stethoscope, but merely used his ear, and then he percussed the lungs, to see if there was any dullness or percussion; that he wrote out the answers to the questions propounded in the medical examiner's report and answered them as the insured gave him the information; that Atcheson told him that he had no heart trouble, and had not been treated for any heart complaint, and that he did not have rheumatism at the time of the examination, and that said witness believed said statements when they were made; that the insured further told him that he had never had any palpitation of the heart; that he asked him if he had ever been an inmate of a sanitarium or hospital, and that insured told him that he had been in a hospital for 3 days in Ft. Worth; that he would not say that insured told him that the Ft. Worth hospital was the only one he had been in or had been treated in, but that he put down his answer just as he made it; that, if the insured had told him that he had been twice in the hospital of Dr. Inge at Denton, the witness would have put the answer down in the report made by him and contained in the application; that he would also have put down the answer of the insured that he had been 18 days in the hospital at Den-

ton, if the insured had so stated, and also that he would have put down the information, if it had been given him by the insured, that the latter had been in Dr. Inge's hospital in March, 1916, and on other occasions heretofore mentioned; that he did not know at the time of the examination anything about the insured's condition of health prior to said time. He further testified that, if a person had had valvular heart trouble in 1914, where the heart leaked, in his opinion such condition would have been incurable; that it might have been benefited, but not cured; that, if the insured had been suffering from palpitation and leakage of the heart and finally died of that trouble at the end of 7 or 8 years, in his opinion the insured would not have been a well man, free from disease, at the time of his application; that during the examination, when they reached question 33, in which the applicant was asked if he had any one of some 40 diseases, symptoms, or conditions of health, including rheumatism, witness put down as the answer to said question "No," because, so far as it referred to rheumatism the question had been already answered in response to a prior question or questions. The witness further testified that, so far as he could determine from a personal and physical examination of the insured at the time of the application, the latter was "all right"; that it was his honest opinion from said examination, that the insured did not have a chronic, incurable disease of the heart during the years 1914 and 1915; that, if he had had such disease, he would not have lived as long as he did and did the work he did, but that if he did have these ailments then and did die from them, then he did not think that insured could have been in sound health or body either in January or February, 1917; that he did not know anything personally about his condition on the 16th day of February, 1917, when the policy was delivered.

L. M. Atcheson, brother of the insured, testified that the latter was 19 years old when he married; that he was closely associated with his brother during the years 1914, 1915, and 1916; that the latter's health was seemingly good in January and February, 1917, and that he had not heard any complaint from his brother for several months before that time; that Dr. Stem did not visit his brother in September, 1916, but visited the mother of witness and insured; that that was the date when his mother was hurt, from which injury she afterwards died; that he had no knowledge of but one spell during 1914 when the insured was confined to his bed; that the insured had developed rheumatism when he was from 9 to 17 years old; that the father of witness and insured moved to Denton to finish the education of Otis, and that he contracted rheumatism while he was living at Denton; that he might have had a little

touch in 1915, and then in the spring of 1917, or in June or July, about when he died; that the insured sometimes complained of rheumatism, but that witness did not believe that he had any severe attacks from June, 1914, until the last attack from which he died; that the insured had no heart trouble only when he had rheumatism; that the witness could see the jugular vein and the pulsations of the blood through it; that he noticed this symptom in 1917, just before the insured died; that the insured complained of his rheumatism off and on at intervals from the time he was 17 years old until the time of his death; that the insured worked on the farm during 1917, sowed wheat, ran an engine, etc.; that he asked both Dr. Stem and Dr. Inge about his brother's condition and they told him that he had rheumatism; that the insured was in bed part of the time; that the doctors told him as long as the insured had rheumatism it would affect his heart, but they did not say that he had heart trouble. He further testified that his brother was at Dr. Inge's hospital in Denton during the fall of 1914 when the witness visited him there, and that he was at said hospital more than once; that he thought about three times, once in 1914 and once in 1915; that when the doctors told the witness that his brother had rheumatism, and that it affected his heart, the witness believed it, and talked to his brother about it, and advised him to take care of himself and that the heart would take care of itself; that his brother went to Hot Springs some time either before or after his marriage for his health "to drive the rheumatism out of him; he was seeking for that all the time;" that he went to Hot Springs to be benefited for his rheumatism. He could not say that he went to Colorado for the same purpose. He had rheumatism at intervals. He further testified that the insured went to Tioga and Mineral Wells and other places, not especially for his rheumatism, but because of his general condition of health. He further testified:

"Some of his joints were swollen with rheumatism, not all of the time. He was stiffened up off and on up to the time of his death except the year 1916. He was suffering from rheumatism more or less worse at times. He had it more or less in 1914; that is my best recollection of it. It looked like he came very near dying with it. The family never gave him up, but we were uneasy about him. Q. During that time what was his trouble? A. Rheumatism. Q. Affected his heart? A. Well, I never did know it, never noticed it affecting his heart until later on, afterwards. He never did get short of breath. I saw some of his joints swollen off and on during the year 1915. I would be with him and see it. I noticed it and then he would always tell, because whenever he would feel the rheumatism come on he would always take a dose of salts, try to remove it. The joints that were generally swollen were under his knees and under his shoulder."

The plaintiff, wife of the insured, testified that she and the insured were married in 1909; that in the spring of 1914 the insured had a spell of rheumatism that lasted some three or four weeks, and that Dr. Stém waited on him, and that Dr. Inge also came to see him; that after that spell he had another attack, one or two weeks, at which time he stayed at Dr. Inge's place in Denton; that the place where he stayed was a dwelling house kept by Mrs. E. S. Littrell; that she and her husband boarded there and Dr. Inge waited on them; that Dr. Stem did not visit her husband during September, 1916; that her mother-in-law was injured on the 2d and died on the 7th of September, and that Dr. Stem and Dr. Inge both visited her; that her husband worked during the year 1916; that she remembered when Otis joined the lodge and got the insurance policy, and that he was well at that time so far as she knew; that she did not know of any doctor visiting him from the latter part of 1915 until he got sick from the spell from which he died, i. e. any doctor visiting him when he was sick at home; that her husband suffered at intervals with rheumatic complaint both before and after they were married; that the first severe attack occurred about two years after they were married; that his joints would swell when he had rheumatism and that it was rather painful; that he tried almost every way to get relief from some source from those attacks; that he usually had a doctor; that the insured had a serious spell in the spring of 1914, one of the most serious ones he had ever had, and he was in bed at the time for something over a month; that after he got up he was in pretty bad shape and was unable to get out of the house and Dr. Stem and Dr. Inge both treated him; that she was with her husband at Dr. Inge's hospital in Denton at one time for one week and for two weeks another time; that these three spells were at some six months' intervals; that Dr. Stem advised her in 1914 that her husband's rheumatism affected his heart; that he explained that the rheumatic trouble caused too much blood, too much work on the heart; that the insured knew that he had rheumatism and that it affected his heart; that he could tell that himself and that the witness could tell it; that she could feel his pulse and "feel it skip and knew it would skip beats"; that Dr. Moore was not their family physician; that during the year 1917 Dr. Stem lived in Slidell, some mile and a half from where witness and her husband lived; that the insured was seriously sick during June, 1917, and up to the time of his death. Witness further testified:

That during the year 1912 the insured went to Hot Springs. "He had not been suffering from rheumatism when he decided to go to Hot Springs. Q. What did he go to Hot Springs for? A. Well, in a way it was rheumatism, but

he did not take a spell of rheumatism. Q. He went for rheumatic trouble? A. Yes. Q. Hoping to be benefited? A. Yes. Q. You knew he was hoping for that, didn't you? A. Yes, Q. Where were you living when he started? A. In Slidell. Q. How long was he gone? A. He was gone about—I was there five days, I believe. I went afterwards. I did not go with him. I think he was there about ten days. * * * He was taking baths over there. He did not have a doctor. He conferred with some one at the bathhouse about taking baths. I think he took three baths. Q. How came it he only took three baths? A. I don't think—it was not what he wanted. Q. He had rheumatism just as bad afterwards as before he took the baths, did he? A. He did not have rheumatism. Q. He went over there for that purpose, didn't he? A. Yes. Q. How long before going over there had he had one of those radical attacks of rheumatism? A. I guess it had been about three months."

Another brother of the insured also testified as to the condition of the insured's health, and his testimony, taken as a whole and in spite of certain contradictory statements to the contrary, tended strongly to show, as does the testimony of Mrs. Atcheson and her brother-in-law, L. M. Atcheson, that the deceased was afflicted with rheumatism and consequent heart trouble for some ten years prior to his death; that he had serious attacks at times when he was confined to his bed and under treatment of physicians; that at other times he was able to do farm work and perform other physical labor. At the time of his application he was apparently free from his rheumatic trouble; at least did not complain of any suffering.

But we have concluded, in view of the positive statements of Drs. Stem and Inge, to the effect the insured for several years prior to his death and prior to his application for the insurance policy in the defendant society, was afflicted with rheumatic trouble, causing swollen joints, palpitation of the heart, shortness of breath, etc., and that, in view of the somewhat contradictory statements contained in the testimony of the witnesses for plaintiff upon these issues, the testimony in the record is not legally sufficient to sustain the judgment rendered. As said in Easton v. Dudley, 78 Tex. 236, 240, 14 S. W. 583, 585:

"The evidence is no guide to the truth. Had the contradictory statements been made by two witnesses, one contradicting the other, the rule that there exists evidence to support the finding of the court would apply; but these statements are made by the same witness, which make his testimony at least of little value, not enough to justify a reliable conclusion."

See, also, Railway Co. v. Walker, supra; Lans v. Bristow, 188 S. W. 970.

[6] As stated by appellant, in the absence of a statute to the contrary, false representations in an application for insurance which the applicant warrants to be true will avoid the policy without reference to the material-

ity of such statements. Modern Order of Prætorians v. Davidson, 203 S. W. 379; Insurance Co. v. Pinson, 94 Tex. 553, 63 S. W. 531; Brock v. United Moderns, 36 Tex. Civ. App. 12, 81 S. W. 340; Insurance Co. v. Blackstone, 143 S. W. 702; W. O. W. v. Lillard, 174 S. W. 619; Jeffries v. Ins. Co., 22 Wall. 47, 22 L. Ed. 833; Modern Woodmen of America v. Owens, supra; 14 R. C. L. 210.

Therefore we conclude that appellant's assignments 1, 2, 3, and 4 must be sustained and the judgment reversed and the cause remanded; and it is so ordered.