296

**F. M. WHITE, Appellant,**

v.

**Arnett LILLEY, Appellee.**

No. 5073.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 22, 1955.

Rehearing Denied Nov. 10, 1955.

Talbert & Giessel, Houston, for appellant.

Helm & Jones, Houston, for appellee.

WALKER, Justice.

The suit is for damages for personal injuries sustained in a collision between an automobile owned and operated by defendant and one in which plaintiff was riding as a guest. It was founded on negligence. The cause was tried to a jury, who returned a verdict for the plaintiff, in response to special issues submitted, and on this verdict the trial court rendered judgment in behalf of plaintiff against the defendant for $15,-000, that being the sum assessed by the jury as plaintiff's damages. From this judgment the defendant has appealed.

### Opinion

Defendant has assigned four points of error for reversal, and all of these bear only on the amount of damages which should have been assessed for plaintiff's injuries.

Point 1 assigns error to the trial court's refusal to permit defendant, in argument to the jury, to comment on plaintiff's failure to make Dr. Kirkham a witness. The objection sustained was, "that that man lives out of the county and we have no control over him." Dr. Kirkham was a physician whose office was in Cleveland, in the county adjoining the county of suit, and he did not testify, in person or by deposition. Plaintiff had known him for about three years, and for several months at the first of that period had been treated by him for a condition of the plaintiff's right lung which eventually required the operation of July 8, 1952, by Dr. Seybold, in which a part of the lung was removed. Dr. Kirkham had sent the plaintiff to Dr. Seybold, and the operation had cured this illness. Plaintiff testified that on the morning after the collision he had gone to Dr. Kirkham, and his testimony shows that he did this to procure medical advice and treatment; that he told Dr. Kirkham of the collision and described his condition, and that Dr. Kirkham examined him; and that Dr. Kirkham prescribed no medicine for him and gave him no treatment but told him to go home and go to bed. Plaintiff also said that Dr. Kirkham told him to go back to Dr. Seybold and that Dr. Kirkham did this because the plaintiff had complained of spitting up blood. Four days later the plaintiff did go to Dr. Seybold, whose office was in Houston, and was examined by him; and Dr. Seybold testified by deposition. This deposition was adduced by the defendant. The plaintiff testified further that Dr. Kirkham was his family doctor; that "he has been our family doctor since he has been in Cleveland;" and that Dr. Kirkham had been treating him and his family since he came to Cleveland. Plaintiff's testimony shows that he had not asked Dr. Kirkham to testify and had not asked his lawyers to do anything about procuring Dr. Kirkham's testimony, but he did say: "If we want him to come, he will be glad to come."

On these facts the defendant had a right to comment on the plaintiff's failure to produce Dr. Kirkham's testimony, and the plaintiff's objection, that he had no control over Dr. Kirkham, was not valid. Dr. Kirkham, being a resident of the adjoining county, was not subject to subpoena under T.R. 177 unless found in the county of suit, but this circumstance also was not a valid ground of objection to defendant's argument since Dr. Kirkham was apparently subject to process under T.R. 195 and 201, to procure his deposition. However, there was no explanation of the failure to produce Dr. Kirkham's testimony, and we do not understand that the existence or not of power to compel one to testify necessarily determines whether a party may comment on his adversary's failure to produce that person's testimony. Concerning the matters discussed, see: Smerke v. Office Equipment Co., 138 Tex. 236, at page 241, 158 S.W.2d 302 at page 305; Missouri Pac. Ry. Co. v. White, 80 Tex. 202, at pages 207–208, 15 S.W. 808, at page 811; Marek v. Southern Enterprises, Inc., 128 Tex. 377, at page 382, 99 S.W.2d 594, at page 597. And see: Houston Electric Co. v. Potter, Tex.Civ. App., 51 S.W.2d 754, at page 762; Montgomery Ward & Co. v. Levy, Tex.Civ.App., 136 S.W.2d 663, at page 670; Gulf, C. & S. F. R. Co. v. Dooley, 62 Tex.Civ.App. 345, 131 S.W. 831, at page 833; Consolidated Underwriters v. Lowrie, Tex.Civ.App., 128 S.W.2d 421, at page 423. For recent expressions by this court see: Consolidated Underwriters v. Foxworth, Tex.Civ.App., 196 S.W.2d 87, at page 98 (Headnote 7); Smith v. Broussard, Tex.Civ.App., 257 S.W. 2d 125.

Nevertheless, the refusal to allow this argument did the defendant no harm, and we overrule Point 1 on this ground. The circumstances indicate the general nature of Dr. Kirkham's findings; for Dr. Kirkham neither treated plaintiff nor prescribed anything for him, which shows that he found nothing requiring any treatment he could give; and since he sent plaintiff on to another physician, it would seem that the other physician would be the more useful witness. The other physician, Dr. Seybold, testified and said that he found no evidence of disability. Dr. Seybold's examination was made only five days after the collision and not more than four days after plaintiff

talked with Dr. Kirkham, and it should have revealed any condition of seriousness which Dr. Kirkham had seen, and it is not likely that Dr. Kirkham could have added anything to Dr. Seybold's testimony which would have lessened the assessment of damages.

■■ Point 2 assigns error to the admission of testimony by plaintiff repeating some instructions given him by Dr. Kirkham after the latter had examined him. The objection in the trial court was, that the testimony was hearsay. The proceeding was as follows: "Q. What examination did he make? A. Well, the usual where they pull off your clothes and then examine you. He told me to go home and go to bed and—

"Defendant's Counsel: Your Honor, we object to that as hearsay, and ask the Court to instruct the jury not to consider it for any purpose.

"Plaintiff's Counsel: I believe that it might be in line with the doctor's prescription for him.

"The Court: Overruled.

"Defendant's Counsel: Note our exception, please.

"Plaintiff's Counsel: Q. You say you were advised to go to bed? A. Yes, sir.

"Q. Did you receive any other advice or treatment? A. He asked me to go back to Dr. Seybold the doctor that operated on me."

Whether this testimony was hearsay depends on the purpose for which it was adduced, and we agree with defendant that if it was adduced to prove that plaintiff was injured by the collision it would be hearsay, if it did in fact tend to prove such an injury. Traders & General Ins. Co. v. Wheeler, Tex.Civ.App., 271 S.W.2d 679. The statement that Dr. Kirkham told plaintiff to go home and go to bed seems to serve no other purpose, but its tendency toward that end is so indirect and remote that it could not have done the defendant any harm, there being

evidence that plaintiff sustained a substantial injury. The statement that Dr. Kirkham told the plaintiff to go to Dr. Seybold does not tend to prove that plaintiff was injured and so was not hearsay; but it actually explains why plaintiff did go to Dr. Seybold and so considered, it is a circumstance in defendant's favor, for it was a recommendation of the witness and the defendant proved this witness's deposition. Point 2 is overruled.

■ Point 3 assigns as error that plaintiff's counsel, in questioning the defendant "injected the issue of insurance." The proceeding complained of occurred during the examination of defendant by plaintiff's counsel and the evidence on which this point depends was the following:

"Q. Your lawyer also mentioned * * * well, first, how much did it cost you to have the car repaired? A. It cost me $50.00.

"Defendant's Counsel: Your Honor, we object to that as being immaterial and inflammatory. The cost of his repairs is of no consequence to the jury. He didn't file any cross action. We think the extent and nature of the damage is all right, but not the cost of repairing the automobile. It would be of no value to the jury.

"Plaintiff's Counsel: *Your Honor, we are attempting to show the violence of the collision.*

"The Court: Overruled.

"Defendant's Counsel: Exception.

"Plaintiff's Counsel: Q. How much did it cost *to get that dent repaired?* A. It cost me $50.00.

"Q. Didn't you testify in your deposition that it cost you several hundred dollars? A. That's right. It did. I carried collision insurance which paid the rest of it." Defendant's counsel then requested that the jury be retired so that he could make a motion, and the jury was retired. Plaintiff's counsel then stated to the court that "before the motion is made and to inform the court as to the questions I was asking Mr. White. You

will find it on page 22 of his deposition," and handed the deposition to the court. Defendant's counsel then moved for a mistrial because of the statement by the witness that "I carried collision insurance which paid the rest of it", on the ground that this statement informed the jury that an insurance company was interested in the case. The trial court overruled this motion on the ground that the statement was voluntary and, after some other statements by counsel, the defendant's counsel excepted to the trial court's ruling. Plaintiff's counsel then proved by the defendant that the defendant had been instructed by his own counsel not to mention insurance, and stated that he was inquiring as to the amount of money and not who paid it. The court also instructed the defendant not to mention insurance voluntarily. The jury was then returned to the jury box and the examination of defendant by plaintiff's counsel proceeded, as follows: "Q. Mr. White, what was the total amount of the cost of repairing the dent in your car? A. About $400.00."

Point 3 is overruled on the same ground on which the trial court overruled defendant's motion for mistrial; the statement by the defendant that he carried collision insurance, which is the only statement defendant objected to in the trial court as informing the jury of insurance and which is, therefore, the only one defendant can complain of here, was voluntary. Defendant apparently argues that it was responsive to questions, but none of the three questions preceding the answer actually called for such an answer; the second pointedly inquired about total expense, and the third, about defendant's own former testimony. The answer had no relation to the purpose plaintiff's counsel had in questioning the defendant, and plaintiff's counsel had stated this purpose in the defendant's presence before the defendant made the statement he now complains of. The defendant's deposition was not put in evidence, but there is nothing in the circumstances which suggests that plaintiff's counsel ought not to have asked the particular question of defendant because he ought to have expected the answer made.

Under Point 4 the defendant argues that the damages assessed were excessive, and asks that a reversal or a remittitur be declared by us. We sustain this contention. There is evidence that plaintiff sustained a substantial injury, but the evidence does not show that any part or consequence of this injury will be permanent. Judged by the operation of July 8, 1952, in which the lower right lobe of plaintiff's lung was removed and which, to perform, required removal of part of a rib, the most disabling element of injury, that is, the supposed lesion of the scar produced by the operation, certainly should not last more than the one year during which, plaintiff said, the effects of the operation lasted, and we note that Dr. Seybold said that at his examination of plaintiff on December 12, 1952, five months after the operation, he found plaintiff so far cured of the effects of the operation that he made no further prescription for him. The other disabling element of plaintiff's injuries was the sprain of the back and neck, and Dr. Markewich, called by the plaintiff, thought that this would be cured in another sixty or ninety days. The duration of the head pain, which varied in intensity, and of the effects of the supposed concussion could not be proved; these troubled plaintiff but were not disabling, at least to any substantial extent. The plaintiff earned an income both as a carpenter and as a constable, but the evidence concerning plaintiff's earnings as a carpenter was indefinite in some respects. The jury, in response to Issue 15, assessed plaintiff's damages at $15,000, for past and future pain and mental anguish, for loss of earnings, and for loss of future earning capacity; and we have concluded that the finding is excessive by $10,000. We accordingly make the following order in compliance with T.R. 440: if plaintiff will file his remittitur of $10,000 in this court within fifteen days after this opinion is filed, we will render judgment reforming the judgment of the trial court so as to award plaintiff $5,000 and affirming it as reformed; but if the remittitur is not filed, the cause will be reversed and remanded to the trial court.

### On Appellee's Motion for Rehearing

As showing permanent injury supporting the jury's assessment of damages, the plaintiff refers to testimony of Dr. Markewich concerning the consequences of scar tissue in plaintiff's lung. First, however, we quote testimony which explains this. Dr. Markewich testified: "Q. At the present time, is it true or not that Mr. Lilley, in your opinion, based on your knowledge and experience, is totally disabled? A. As of the last examination, yes. That was the 10th of November, 1954.

"Q. And you say that with this condition —let me back-track just a minute. Assuming, doctor, that the operation Mr. Lilley underwent in 1952 was successful or·was a good operation, that he recovered from that operation and went back to doing his duties as a carpenter and Constable; assuming that he did recover and then had this accident where scar tissue was torn loose again, is it your opinion, do I understand your opinion to be that straining work is likely to tear it again? A. Yes; that is a possibility. You might get a collapse of the lung, and it might be sufficient to tear into the good area of the lung.

"Q. Then I understand your opinion to be that it might make the lung collapse and might be sufficient to tear into the good part of the lung? A. That is a possibility, and it should be under observation.

"Q. Doctor, when you operate and that scar tissue forms, is that for good? A. Sure; that is permanent.

"Q. That is permanent? A. Yes, sir; and when it is torn, it heals with more scar tissue which is also permanent."

Dr. Markewich then gave the testimony which plaintiff cites as showing permanent injury supporting the assessment of damages. This was:

"Q. —Assuming a man had surgery where the lower lobe of the·right lung was removed; that that operation healed up; that it· was a successful operation; that after a period of time the man was able to go to work; assuming that at some later date he was involved in an accident where he received a blow over the same area causing a tearing of scar tissue which was already present causing blood to be spit up; assuming those facts to be true, let me ask you ·first of all—and I believe it has been established—is scar tissue a permanent thing; assuming that it be true, I will ask you if you have an opinion as to whether or not the tearing of that scar tissue weakens a person to such an extent that he is going to be troubled with doing work and straining for the balance of his life; do you have an opinion about that? (Proceedings omitted) A. Yes; ·I have an opinion.

"Q. What is your opinion as to its causing him trouble permanently so far as strenuous work is concerned? A. The additional aggravation of injury on top of the operation has disabled this man, and in *all probability, the old tissue and the new tissue being formed in that area will bother him the rest of his life, but it is rather difficult to say. There is a good probability that it will continue, but that will depend on further observation.*"

The statement italicized is the basis of the plaintiff's contention; and the opinion expressed therein is indefinite as to the seriousness of injury for it is really only this, that a certain condition probably will "bother" the plaintiff. This condition seems to be the formation and existence of scar tissue in the plaintiff's lung, or at least it can be so construed. However, the opinion expressed does tend to prove that this condition will be permanent.

Before giving any of the testimony quoted, Dr. Markewich very plainly said that he did not know how long the lesion would continue which, he thought, had occurred in the healed area of, or scar tissue, left by the operation of July, 1952, on plaintiff's right lung. He testified:

"Q. What about this chest condition that you found, the tearing of that scar tissue? Is that a permanent thing? Is that something that is going to bother·Mr. Lilley and be a source of trouble the rest of his life? A. That is a condition that I can't say how

## 301

long it will last. Even an X-ray will not show you that. It is all soft tissue, so we just don't know.

"Q. What would be your advice to Mr. Lilley, taking into consideration the prior operation that he had when a part of his lung was removed, taking into consideration also your diagnosis of tearing loose part of the scar tissue, what would be your advice to Mr. Lilley about getting out and working, straining and so on? A. At the present time, I would advise him to be under the constant supervision of a physician. I would advise him to see a physician or the physician who operated originally every two or three weeks. I would advise him not to attempt to do any heavy work or straining which can aggravate the condition or affect the good lung area. He should check back with his doctor at frequent intervals. How long he should do this depends on the progress of the case. At this time, he is under the supervision of myself."

Now it is the lesion in the old scar tissue, or healed area, of the operation of July, 1952, which was the disabling element in suit, not the presence of unbroken scar tissue, and it is this condition of which the doctor had just said he can not predict the duration. If we say that this opinion is in conflict with that which we first quoted, namely, about the continued effect of scar tissue, then it must be said that there is nothing in the evidence by which the jury could decide that one opinion was right and the other was wrong, and we would have to apply the rule stated in Easton v. Dudley, 78 Tex. 236 at page 240, 14 S.W. 583 at page 584. For the circumstances in evidence are not enough and the only other physician who testified, Dr. Seybold, had not found any evidence of disability which would support the assessment of damages. He said: "Q. Would it be a fair summary to say that your examination of the man was negative all the way around with reference to any disability he might have? A. Yes; so far as the physicial examination was concerned, I could find no evidence of any disability."

However, we think that the two opinions are not necessarily in conflict, that the one last quoted concerns the existing lesion in plaintiff's lung, which was the principal disabling element found by Dr. Markewich, and the one first quoted concerns the formation and effect of scar tissue when this lesion had healed, or at least can be so construed—and if it is not it will simply conflict with the opinion last quoted. Construing these opinions in this way it is the one first quoted, that about scar tissue, which will "bother" the plaintiff. We construe the latter opinion as meaning that the presence of scar tissue from the operation of July, 1952, and from the healing of the lesion in this old scar tissue will subject the plaintiff to some necessity of avoiding conduct which would produce another lesion and, to this extent, entail a limitation on plaintiff's conduct.

How serious would such a consequence be? It is to be remembered that the plaintiff had a certain amount of scar tissue from the operation of July, 1952, in which Dr. Seybold had he removed the lower right lobe of the plaintiff's lung and would seem to be as apt to tear this scar tissue as any other, and yet the plaintiff, according to his testimony, was in good health at the time of the collision in suit and was gainfully and fully employed, both as a carpenter and as a constable. This operation was plainly a very serious one and there is simply no reason apparent to us in the evidence now before us—and that, of course, is the test of plaintiff's claim—why any lesion in the healed area of this operation caused by the collision should take a substantially longer time to heal or should produce a permanent limitation upon plaintiff's conduct materially greater than an operation in which the bottom part of the plaintiff's right lung was cut off. These considerations are material because the question made is one of fact. Wilson v. Freeman, 108 Tex. 121, 185 S.W. 993.

The expression of opinion by Dr. Markewich first quoted, that about the scar tissue, does tend to show a consequence of plaintiff's injury which is permanent and to this extent our original opinion is amended. However, as we construe this, nothing was shown which would justify the assessment

302

made or would justify an award of $10,000 and so we overrule the plaintiff's motion for rehearing. Since plaintiff has declined to make the remittitur suggested, the judgment of the trial court is reversed and the cause is remanded. T.R. 440: Freeman & Freeman Oil Co. v. Lyman, Tex.Civ.App., 121 S.W.2d 644 at page 648.