RICHARDS v. TRAVELERS' INSURANCE COMPANY.

1. "Fall," as used in the complaint in an action on an accident policy, alleging that insured fell from the cars and received injuries from which he died, implies an accidental event.

2. A provision in an accident policy classifying insured as "a cattle dealer or broker visiting yards by occupation," which restricts him to the occupancy of cars provided for transportation of passengers, is inoperative, and he may climb on and ride on the top of a freight car when it becomes necessary in order to pursue his business in the ordinary and usual manner.

(Opinion filed July 13, 1904.)

Appeal from circuit court, Lawrence county; Hon. LEVI McGEE, Judge.

Action by Lottie A. Richards against the Travelers' Insurance Company. Judgment for plaintiff. Defendant appeals. Affirmed.

*Frawley & Laffey* and *E. J. Frawley*, for appellant.

*Moody, Kellar & Moody* and *S. C. Polley*, for respondent.

FULLER, J.    As the beneficiary named in an accident policy held by her husband at the time of his death, plaintiff recovered the full amount claimed, and the defendant appeals.

The injury resulting in the death of Mr. Richards occurred in the afternoon of the 7th day of April, 1900, in the vicinity of the Sioux City stockyards, near the Seventh street crossing. When first seen in that locality, he was lying face downward on the top of a freight car loaded with horses belonging to him, and which he had shipped from Whitewood, in this state. At this time the car was standing still, but the railroad employees were making up a train; and, as soon as this particular car was reached, the yardmaster discovered Richards lying in the position above mentioned, on top of the car, with his head on the running board.    Concerning the matter, one of the witnesses testified in part as follows: "When the cars were coupled, a railroad man—I think it was the yardmaster—went

up to this man Richards, took him by the shoulder, and shook
him and told him he would have to get down and go into the
way car, as the train was about to pull out. The fellow did get
up, and commenced to look around as though he didn't know
where to get down. The railroad man told him to come down
this way, and come down the ladder. The railroad man went
down the ladder. Mr. Richards instead of going
down the ladder, took hold of the brake on the other car, and
stepped over onto the next car. By this time the yardmaster
had got down onto the ground, and we were looking up to see
what kind of a move the fellow was going to make next. Just
then he staggered off the footboard on the side of the car, and
fell off. One of the railroad men cried: 'Look out! the man
is going to fall. For God's sake! let's catch him.' The three
of us stepped up to the side of the car and put our hands up to
save the man from falling, but, instead of rolling off as we ex-
pected he would, he turned, and staggered and fell, and went
right through our arms, and struck on the rail next to the
track adjoining the track where the cars stood. The distance
between the rail on which his head struck and the next rail un-
derneath the car from which he fell I would say was about
four or six feet. After he struck the rail he was unconscious."
The foregoing testimony is fully corroborated by the yardmas-
ter, who further testified that Richards had ridden on the top
of this car from the Union Stockyards to the place where the
car stood when the accident occurred, and that the car was to
be taken into a freight train to go north at about 3:50 p. m.
Concerning the time, place, and circumstances, he further
stated that "the accident occurred at about 3:30 p. m. When I
first saw Richards, he was lying down on top of the car, his

feet toward the outside, his face resting on his arms, and his head about the middle of the car. His feet were just about the outer edge. After this car came up from the stockyards with Richards riding on it, we were waiting for these two cars, and shoved them into the head end of the train. I rode the two cars in, stopping them north of the Seventh street crossing, as the rest of the train was below Seventh street. After stopping them, I spoke to Richards. I next spoke to Richards on top of the car, asking him if that was his car. He said it was, and asked me where the caboose was. I showed him the caboose on the rear end of the train, and told him he would have to come down that side ladder—the one I was just coming down. Then he sat up as I was coming down, but he had not stood up. I then went down the ladder to the ground. I next saw him just as he was stepping to the next car south or west, when he was in a staggering position. He was just in the act of stepping over to the next car. His body was on the other car, and I think he had hold of the brake wheel. He next took two or three steps first one way and then the other. He balanced for a moment on one foot on the edge of the car, and then pitched head-first to the ground."

The insured is classified in the policy as "a cattle dealer or broker visiting yards by occupation," and the insurer is obligated to pay his widow $1,250 in case death resulted from bodily injuries "effected during the time of this insurance through external, violent and accidental means," provided, among other things, that "this insurance shall not cover injuries from voluntary exposure to unnecessary danger, or from intoxication or while intoxicated. Nor shall this insurance cover accident, injuries or death, or loss of limb or sight,

resulting directly or indirectly from entering or trying to enter or leave a moving conveyance using steam as a motive power (except cable and electric cars) or while being in any part thereof not provided for occupation by passengers."

It being alleged in the complaint, and admitted in the answer, "that on or about the 7th day of April, 1900, while said policy was in full force and effect, said Arthur L. Richards fell from the cars in the city of Sioux City, and received injuries from which he afterwards died," there is no merit in the contention that the evidence fails to show that the death of the insured resulted from external, violent, and accidental means. The word "fall," as here used, implies the happening by chance of an undesigned and involuntary event which in this case resulted in bodily injuries effecting the death of the insured through external, violent, and accidental means, clearly within the terms of the policy. Moreover, the evidence offered on the part of the defense, after its motion for a directed verdict was denied, conclusively shows that Richards did all in his power to avoid falling, and thus obviate the accident which proved fatal. Under any view of the case, it clearly appears that the injury was not self inflicted, nor the immediate result of voluntary exposure to unnecessary danger. Scheiderer v. Travelers' Ins. Co., 58 Wis. 13, 16 N. W. 47, 46 Am. Rep. 618; Wilson v. Northwestern Mut. Acc. Ass'n, 53 Minn. 470, 55 N. W. 626; National Benefit Ass'n v. Jackson, 114 Ill. 533, 2 N. E. 414.

The jury having found, from sharply conflicting testimony, submitted under proper instructions, that Mr. Richards was not intoxicated, it becomes important to determine whether a person rated, classified and insured as "a cattle dealer or bro-

ker visiting yards by occupation" may be restricted by his policy to the occupancy of cars provided for the transportation of passengers, by the use of steam as a motive power, or whether he may climb upon and ride on the top of a freight car whenever it becomes necessary in order to pursue his business in the ordinary and usual manner.

That the rate of insurance was based upon the nature of the business in which he was engaged clearly appears from the following letter written by the company concurrently with the issuance of the policy:

"St. Louis, Mo., Sept. 5, '99. Mr. A. L. Richards, Whitewood, S. D.—Dear Sir: I am just in receipt of a letter from you which I note is dated July 19th, 1899; the letter, however, was received today, and of course it will be necessary for me to adjust the matter referred to as of current date. In view of the fact that your occupation is that of 'cattle dealer and broker,' and as you probably visit yards, etc., the proper rate to be charged you is $10 for each $1,000 insurance, with $5 weekly indemnity, and as you paid Mr. Olney $12.50 this would purchase a policy of $1,250 with $6.25 weekly indemnity, $12.50 premium. I therefore have written and enclose herein policy No. 1,332,471 in these amounts, which I trust will dispose of the matter to your satisfaction."

Upon the theory that a person insured as "a cattle dealer or broker visiting yards by occupation" may do whatever is customary among reasonably prudent men engaged in the same occupation, respondent was permitted to prove that it was the usual practice and absolutely necessary for persons thus employed to ride upon the top of cars from the chute where live stock is loaded in Sioux City to the railway yards

where trains are made up, and, on account of the distance from
the stockyards to the railway yards, and the great number of
tracks therein, there is no other way to know the location of
his cars, and get out of the city on the train into which they
are taken.   Modern courts very justly hold restrictions in ac-
cident policies inoperative, which render the insurance nuga-
tory and valueless by attempting to avoid liability for injuries
sustained by the insured while performing necessary acts em-
braced in his classified occupation.   In the case of Dailey v.
Preferred Masonic Mutual Accident Association (Mich.), 57 N.
W. 184, 26 L. R. A. 171, the Supreme Court of Michigan de-
nied the right of the insurer to insist upon a provision in a
policy issued to a railway passenger conductor to the effect
that nothing would be paid for injuries or death occasioned by
an attempt to enter or leave moving conveyances using steam
as a motive power, and that such acts were necessary and
justified on the part of the insured was judicially noticed.   So
a provision in a policy issued to a railway engineer attempting
to limit the liability of the insurer to "death caused by an ac-
cident while traveling by public or private conveyance provid-
ed for the transportation of passengers" was adjudged to be
ineffectual, and it was held that, while an engine is not a con-
veyance provided for the transportation of passengers, the
company was liable for the death of the engineer, who was
killed while operating his locomotive.   Brown, Adm'x of
Brown, v. Railway Passenger Assurance Co., 45 Mo. 221.   In
an action on a fire insurance policy covering a stock of candies,
confectionery, toys, fruit, and all such other stock as is usu-
ally kept for sale in confectionery stores, and containing a
provision that such policy should "cease and determine if * * *

fireworks should be kept temporarily or otherwise," it was shown that such prohibited articles were in fact kept in the stock, and testimony was admitted to prove that such articles are usually kept for sale in confectionery stores; and it was held that the custom was sufficient to destroy the effect of the condition, and that plaintiff was entitled to recover. Plinsky v. Germania F. & M. Ins. Co. (C. C.), 32 Fed. 47. Again, in an action on a policy to recover for an injury sustained by a cattle dealer while attempting to climb to the top of a car that was under full headway, in order to avoid being left at a way station, it was held competent for the insured to show that it was the customary practice of men engaged in his business to accompany their stock to market and board freight cars whenever it becomes necessary to do so in order to get animals upon their feet that have fallen or lain down upon the floor. Speaking for the Circuit Court of appeals concerning the proposition, Judge CALDWELL says: "In the matter of accompanying his cattle to market and caring for them while in the course of transportation, the plaintiff could rightfully do whatever was customary with other cattle dealers under like circumstances and conditions. The plaintiff had a right, if it was not his duty, to incur all the risk and danger incident to caring for and looking after his cattle in the cars, while en route to their destination, in the time and manner customary among reasonably prudent and careful shippers; and such risks and dangers, no matter how great they are, do not constitute any violation of the provisions of the policy requiring the plaintiff to use due diligence for his personal safety and protection. Nor is the incurring of such risks and dangers a voluntary exposure to unnecessary dangers, within the meaning of that

clause in the policy. Whether the assured at the time he received his injury was engaged in doing something outside of the occupation covered by his policy, or whether, though in pursuit of an occupation covered by the policy, he exposed himself to unneccessary danger, and did not exhibit due regard for his personal safety, such as an ordinarily prudent man charged with the same duty, and placed in like circumstances, would have done, were questions of fact for the determination of the jury." Pacific Mut. Life Ins. Co. v. Snowden, 58 Fed. 342, 7 C. C. A. 264.

The view we have taken renders it unnecessary to specially discuss the remaining assignments of error, all of which have received careful consideration.

As no error of law occurred at the trial and the verdict is abundantly sustained by the evidence, the judgment appealed from is affirmed.