## CONSOLIDATED UNDERWRITERS v. FOXWORTH.

### No. 4342.

Court of Civil Appeals of Texas. Beaumont.

June 7, 1946.

Rehearing Denied July 19, 1946.

88

Vinson, Elkins, Weems & Francis, of Houston and Pitts & Liles, of Conroe, for appellant.

Campbell & Foreman, of Livingston, and J. W. Strode, of Conroe, for appellee.

WALKER, Justice.

This is a compensation case. The plaintiff, George N. Foxworth, was employed by Foster Lumber·Company as a watchman, and on June 9, 1944, fell from certain steps, or a stairway, in the lumber mill of his employer. The cause was tried to a jury who found in response to special issues that plaintiff sustained personal injuries on June 9, 1944, as a result of falling from steps; and that said injury was sustained in the course of his employment with Foster Lumber Company and resulted in his being totally and permanently incapacitated to work. They found further that plaintiff's incapacity to work was not temporary; that said incapacity was not "due solely to melancholia not produced or aggravated by the accidental injuries, if any, of June 9, 1944"; and, in effect, that the facts required the payment of compensation insurance to plaintiff in a lump sum. The trial court entered a lump sum judgment in plaintiff's behalf on this verdict for a period of 401 weeks, less payments already made to the plaintiff, and defendant has appealed.

Under Point 1, defendant assigns error to the trial court's definition of *"permanent incapacity.* The substance of defendant's argument may be thus stated: The trial court correctly defined *total incapacity"* but when the jury arrived at the Issue submitting the question, whether total incapacity would be permanent, the definition of *permanent incapacity* apparently qualified the definition of *total incapacity* and tended to mislead the jury into finding that plaintiff would be totally and permanently disabled although he was or would be, in fact, only partially incapacitated.

Point 1 is overruled. The definition of permanent incapacity seems informal but the definition of total incapacity and the way in which the various special issues were put to the jury obviated any possibility that the definition of permanent incapacity would be given the effect suggested by the defendant. If the definition of permanent incapacity was erroneous, the error was harmless.

The trial court gave the following definitions of injury and of total, partial and permanent incapacity:

"By the term 'injury,' as used in this charge, is meant damage or harm to the physical structure of the body and·such diseases or infections as naturally result therefrom. * * *

"The term 'total incapacity,' as used in this charge, does not imply an absolute disability to perform any kind of labor, but a person physically disabled to such an extent or degree that he is disqualified from performing the usual tasks of a workman in such a way as to enable him to procure and retain employment is ordinarily regarded as totally incapacitated.

"You are further instructed that by the term 'partial incapacity,' wherever it may appear in this charge, is meant that degree of physical disability which does not prevent one from procuring and retaining employment, but which, nevertheless, disables him from performing some of the material duties of his employment, or other classes of employment which he could have performed but for his injury, if any, as a result of which he is able to engage only in a class of employment which is less remunerative than that which he was capable of performing before his injury, if any, as a result of which he suffers a depreciation or reduction in his earning capacity.

"By the term 'permanent incapacity,' as used in this charge, is meant that a person is permanently disabled, either wholly or partially, *and will never again be able to do his full work as he did before the alleged injury."*

The concluding language of the last definition (which we have italicized) is that to which defendant objects under Point 1.

The matter of plaintiff's injury and incapacity to work were submitted to the jury in the following Special Issues, to which the jury's findings have been subjoined:

"Special Issue No. I: Do you find from a preponderance of the evidence that George N. Foxworth sustained personal injuries on June 9th, 1944, as a result of falling from steps? Answer 'Yes' or 'No.' Answer: Yes.

"If you have answered the preceding issue 'Yes,' and only in that event, you will answer the following special issue:

"Special Issue No. 2: Do you find from a preponderance of the evidence that such injury, if any, sustained by George N. Foxworth on June 9th, 1944, as a result of falling from steps, was an injury sustained in the course of his employment with Foster Lumber Company? Answer 'Yes' or 'No.' Answer: Yes.

"If you have answered Special Issue No. 2 'Yes,' and only in that event, you will answer the following special issue:

"Special Issue No. 3: Do you find from a preponderance of the evidence that George N. Foxworth has suffered or will suffer total incapacity to work as a result of injuries, if any, sustained by him on June 9th, 1944? Answer 'Yes' or 'No.' Answer: *Yes.*

"If you have answered Special Issue No. 3 'Yes,' and only in that event, you will answer the following special issue:

"Special Issue No. 4: Do you find from a preponderance of the evidence that such total incapacity, if any, is permanent? Answer 'It is Permanent' or 'It is not permanent.' Answer: It *is* permanent.

"If you have answered Special Issue No. 3 'Yes,' and only in that event, you will answer the following special issue:

"Special Issue No. 5: Do you find from a preponderance of the evidence that said total incapacity, if any, is temporary? Answer 'It is Temporary' or 'It is not temporary.' Answer: 'It *is not* temporary.

"If you have answered Special Issue No. 5 'It is temporary,' and only in that event, you will answer the following special issue."

From the foregoing, it appears that the issue submitting permanent incapacity (No. 4) follows directly after the issue submitting total incapacity (No. 3). It was conditioned upon a finding of total incapacity in response to Issue 3, and it affirmatively required the jury to find whether "*such* total incapacity" (obviously that previously found under issue 3) would be permanent. The language of these issues and the order in which they were arranged thus directed the attention of the jury so clearly to the definition of total incapacity, and put to them so directly the question of whether this very total incapacity would be permanent, that only strong language could have diverted their attention from the definition of total incapacity and caused them, in effect, to substitute therefor the matter in the definition of permanent incapacity to which defendant objects. Language of so positive and forceable a character is not in the charge; the objectionable matter in the definition of permanent incapacity can be, and if the jury gave it any significance at all, most probably was referred to and treated as the equivalent of certain language in the definition of total incapacity, to which, as previously stated, defendant assigns no error.

■ The definition of total incapacity begins with the statement that such incapacity "does not imply an absolute disability to perform any kind of labor" and then proceeds with an explanation of what the term does mean. The definition of permanent incapacity begins with the statement that the term refers to a person who "is permanently disabled, either wholly or partially"; this directed the jury's attention to the previous definitions of total and partial incapacity and required them to apply those definitions. The definition of permanent incapacity then proceeds with the additional statement—"And will never again be able to do his full work as he did before the alleged injury;" the substance of defendant's argument is that the jury were apt to be led by this clause into applying this clause literally instead of the definition of total incapacity given elsewhere in the

charge, but we think otherwise. We think it more likely that the jury, if they did not treat the objectionable language in the definition of permanent incapacity as being meaningless, construed said language as only a reference to the opening statement in the definition of total incapacity (that total incapacity did not "imply an absolute disability to perform any kind of labor"), and as an attempt to express the same thought in another form. It seems wholly improbable that the jury would have misapplied, or failed to apply, the definition of total incapacity after their attention had been directed to that definition and they had been required to find whether that very incapacity would be permanent, not only by the language of Issue 4 but also by the opening statement in the definition of permanent incapacity.

Under Point 2, defendant assigns error to the trial court's refusal to submit defendant's requested Issue 2, reading as follows:

"Do you find from a preponderance of the evidence that the Plaintiff, George N. Foxworth, went up the steps where he was later injured for the sole purpose of personally visiting with Isaacs and Foster, and not in connection with his duties as a nightwatchman?"

This issue may not be supported by defendant's pleadings (see Rule 94, Texas Rules of Civil Procedure), but we will dispose of Point 2 on the merits. Requested Issue 2 presents the defense that plaintiff was not injured in the course of his employment; defendant says that the evidence raises the issue that plaintiff had stepped outside of his employment to visit his coemployees, Isaacs and Foster, and was injured while so engaged.

The record exhibits the following matters: On June 9, 1944, plaintiff was a nightwatchman for Foster Lumber Company in the Company's plant at Fostoria, in Montgomery County, Texas. He worked a 12 hour shift. He went on duty at 5:30 that afternoon and was injured between 10:00 and 11:00 o'clock that night as a result of a fall from steps leading from the basement floor of the company's lumber mill up to a platform on which stood certain machinery referred to throughout the statement of facts as the "hog." The principal working part of the "hog" was a cylinder to which a number of knife blades were bolted. Wooden slabs were poured into this machine from the mill floor next above the basement floor, and were ground into small pieces for later use as fuel. The platform carrying the "hog" was placed between the basement floor and the mill floor next above the basement; it was about 12 x 14 feet in size; or perhaps 14 x 14 feet, and stood about 6 or 8 feet above the basement floor. The steps referred to above afforded the only access to this platform; there were no steps from the platform to the mill floor above. The "hog" was operated by a cross-belt running from a turning shaft, referred to as the line shaft, which was a part of the machinery in the mill basement. Two or three large electric globes illuminated this platform, when needed.

The blades in the "hog" were changed every two days; and new blades were placed in the machine on the night of June 9, 1944, by plaintiff's coemployees Foster and Isaacs who were apparently assisted by other persons not identified. Foster and Isaacs were oiler and millwright respectively in this mill at Fostoria; they went off duty at 5:30 o'clock that afternoon but returned about an hour later and worked at one or more repair jobs, finishing with replacement of blades in the "hog." While they were performing this task, plaintiff ascended the steps to the platform where they were and talked to them. The subject matter of the conversation was not proven; Foster and Isaacs did not recollect what had been discussed and plaintiff did not undertake to say. The work on the "hog" was completed some 10 or 15 minutes later; and Foster and Isaacs left the platform. Plaintiff remained behind but left very shortly after; when Foster and Isaacs were a short distance away (Foster said 30 or 35 feet and Isaacs said, about 20 feet) they heard the sound of plaintiff's fall and on turning about saw plaintiff lying on the floor at the side of the steps. These steps were without bannisters; plaintiff said that as he started down them, he stepped on some-

thing, fell over the side and struck his head against the concrete floor.

At the core of defendant's argument that the evidence raised an issue of deviation by plaintiff from the course of his employment is the assertion, in effect, that a reason given by plaintiff for being on the hog platform was contradicted by testimony from plaintiff's coemployees Foster and Isaacs and from Dalton, the mill manager. On deposition before trial, plaintiff testified that there was danger of a "hot box," that is, of fire originating in the pulley boxes housing the pulleys turning the "hog" because of the speed at which these pulleys revolved; and his testimony showed a purpose by him to determine whether there was any likelihood of a fire. Foster and Isaacs denied that there was any "hotbox" in these pulleys on the night of June 9, 1944. Foster said he didn't see plaintiff do anything other than stand around and talk a few minutes; Isaacs said, when asked whether plaintiff checked any boxes on the "hog": "Not to my knowledge he didn't; not that I know of." Dalton testified that it was the business of Foster and Isaacs to determine whether there were any "hot boxes" in the mill (and Foster testified to having made such an inspection before he left the mill on the afternoon of June 9th, apparently in another part of the mill); that the pulleys would cool down past the danger point within 30 minutes after the mill operations ceased ("although it depends on the thickness"); and that on June 9, 1944, the mill closed at 5:30 P. M. He said further that there was no possible danger from fires at 10:00 o'clock at night; and as stated, plaintiff fell from the steps some five hours after the mill closed, between 10:00 and 11:00 at night.

■ Point 2 is overruled. There is no dispute as to what plaintiff's duties were or where they were to be performed; only plaintiff and Dalton, the mill manager, testified on this matter and they are in substantial accord. Plaintiff's employment as a nightwatchman in this mill began before the United States entered the late war; and during the earlier part of his employment he followed a regular "beat," or path, about that part of the premises delivered over to his care. However, after the entry of this country into the war his instructions were changed somewhat; he continued to follow a course defined to the extent of there being six fixed points on the premises to which he had to go and there take down an appropriate key and with it operate a mechanism in his watchman's clock, showing thereby on a dial that he had been present at this place at a certain hour; but he was expected to be more vigilant and to inspect more carefully a wider area than before. As he said: "They gave us a little different orders. We changed about and would go here and yonder. We didn't have, of course, the same beat, but would be changed around and be more particular and more watchful and so on, you know; and we had practically the same beat, but you had places to cover." The premises he watched included the mill where he was injured; and one of the fixed points to which he had to go was near the center of the mill, in the mill basement. It was his business to watch for fire and to protect the plant from trespassers, and it is quite plain from the record that plaintiff was authorized to go to any part of the premises committed to his care; and it is a necessary implication from the nature of his employment and the circumstances under which he performed his duties that he had to determine for himself what part of the premises within his charge he should enter and inspect from time to time, subject only to the routine matter of his being at the six fixed points to which we have referred. He worked at night after the mill ceased to operate. The plant was quite large; over 250 men were employed there and the entire premises were watched by three watchmen. As regards performance of his duties, he had a right to go on the "hog" platform; Dalton so stated. Foster said that he had seen plaintiff both upstairs and downstairs in the mill, and Isaacs said he had seen plaintiff on the "hog" platform on other occasions.

The circumstances pointed out by defendant are not very convincing evidence that plaintiff's testimony misstated his motive in going to the "hog" platform; for when plaintiff's deposition is considered as a whole, it only shows that he intended

the inspection as a matter of routine, and he could very well have made a casual visual examination of the pulley boxes without attracting the attention of Foster and Isaacs who were at work on other matters. There is nothing in the testimony given by plaintiff on trial requiring any other conclusion; on trial, he testified, in substance, only that he went to the "hog" platform in the performance of his duties. He never did say that any one told him there was a "hot box" in any of these pulleys or that he expected to find one; he only said that: "Those boxes from those big pulleys, they get hot, and we are mighty particular about those boxes. We looked after them like we would this outfit and everything else. So I looked over the boxes and started down." There is nothing to show that he did not make this inspection immediately after Foster and Isaacs left the platform. He testified further that "We have to look after them two or three hours or three or four hours to be safe you know." Dalton, the mill manager, said that the boxes would cool past the danger point within 30 minutes after the mill closed, and that there was no danger from fire after 10:00 o'clock; but a conscientious watchman might well have thought it proper to maintain a routine inspection for several hours after the mill closed, as plaintiff's testimony showed was done in the Fostoria mill. Dalton said that a number of mills had burned at night, and in effect testified that it was "the supposition" that such fires were caused by "hot boxes," if they occurred even as late as midnight. Isaacs, the millwright, said: "I wouldn't think it (referring to one of those pulley boxes at the time plaintiff fell) would stay too hot. It might have been warm. It would be pretty well cooled down." There is little here to contradict plaintiff's testimony regarding his reason for being on the "hog" platform.

However, the only direct evidence in the record as to what plaintiff's motive was in going on the platform comes from plaintiff himself. The jury could disbelieve his statements, but they could not find that plaintiff had another purpose in mind (specifically, that he went to the "hog" for the sole purpose of visiting friends) without evidence to that effect, and the relevant evidence aside from plaintiff's own testimony shows nothing but the performance by plaintiff of his duty as a watchman.

As has been stated above, Foster and Isaacs left the mill at 5:30 P. M. when the mill closed and returned to the mill about an hour later. They worked at other matters for a long time before they changed the blades on the "hog." There is testimony from Foster that they did work requiring the melting and pouring of babbitt metal which they melted at a wood fire outside the mill, although Isaacs did not remember so doing. At any rate, there was a good deal of work to be done that night, and others were present to take part in this; Foster remembered the name of one of these workmen, but the others were not identified. This work, of course, was done at night and required illumination. Although neither Foster nor Isaacs remembered what plaintiff talked about when he was on the platform, they did remember that he carried his watchman's clock and a flashlight. Now if plaintiff's testimony be disregarded and only the foregoing matters, and the facts hereinbefore set out are considered, the record only shows that plaintiff, while at work as a nightwatchman, charged with the duty of protecting the premises against fire and trespassers, went to a place in the mill where he had a right to go and where the performance of his duties might well take him, and there engaged his coemployees in desultory conversation for a few moments. Unless he knew in advance who was on the platform, and there is no evidence respecting this in the record, he owed his employer the duty of going to the platform and determining who was present and what they were doing. If he did know who was there, he at least had the right to inspect the platform to determine whether there was any danger of fire or other damage from the work, and the fact that he remained behind after Foster and Isaacs left the platform indicates that he may have done so. This record will not support the inference that plaintiff went on the "hog" platform for a purely personal reason.

If there is any suggestion that plaintiff had a personal motive for going to the

platform as well as the performance of his duty as watchman, the trial court correctly refused defendant's requested Issue 2 because that Issue submitted the question, whether plaintiff's motive was *solely* personal to him.

The authorities cited by defendant, to-wit, Safety Casualty Co. v. Wright, 138 Tex. 492, 160 S.W.2d 238; Texas Employers' Insurance Ass'n. v. Bailey, Tex. Civ.App., 266 S.W. 192; and Aetna Life Insurance Co. v. Burnett, Tex.Com.App., 283 S.W. 783, are not in point, for in each of these cases the employee's injury grew out of a risk of harm which was incidental to acts of the employee not related in any way to his employment. The record before us shows a different situation; the steps from which plaintiff fell were on the premises watched by plaintiff, and the plaintiff might well have fallen from these steps at the very time he did, in an undoubted performance of his duties. The risk of injury by falling from these steps was thus incidental to plaintiff's employment. Plaintiff argues that even if he had gone to the platform for the sole purpose of visiting his coemployees, he would have been acting in the course of his employment, and there is authority indicating that the casual and momentary interruption of the plaintiff's course about the premises which has been proven here was so naturally an incident of the sort of work done by plaintiff and so reasonably to be expected of him that further evidence would be required to prove deviation from employment. See: Robinson v. State, 93 Conn. 49, 104 A. 491; 71 C.J. 680; Federal Surety Co. v. Ragle, Tex.Com.App., 40 S.W.2d 63; Security Mutual Casualty Co. v. Wakefield, 5 Cir., 108 F.2d 273; 45 Tex.Jur. 510, § 107 et seq. However, the point need not be decided.

Defendant's Point 3 reads: "Error of the trial court in not submitting to the jury the defendant's special requested Issue No. 4, calling upon the jury to determine whether or not the injury sustained by Plaintiff on June 9, 1944, was the producing cause of total permanent incapacity."

Defendant's Requested Issue 4 reads: "If you have answered Special Issue No. 3 'Yes' and Special Issue No. 4 'It is permanent,' and only in that event, then answer:

"Do you find from a preponderance of the evidence that the accidental injury, if any, sustained by Plaintiff, of June 9, 1944, was the producing cause of such total permanent incapacity? Answer: 'Yes' or 'No.' Answer: ———

"By the term 'producing cause' as used in this issue is meant a cause which in a natural and continuous sequence produces the incapacity, if any, and if it did, and without which the incapacity, if any, would not have occurred."

The two issues on which Requested Issue 4 was conditioned, Nos. 3 and 4, were parts of the trial court's charge and have been quoted above. Issue 3 submitted the question, whether plaintiff "has suffered or will suffer total incapacity to work as a result of injuries, if any, sustained by him on June 9, 1944"; and Issue 4 submitted the question, whether "such total incapacity, if any, is permanent."

Point 3 is overruled. Requested Issue 4 was properly refused because the subject matter thereof was submitted to the jury in the issues of the trial court's charge on which it was conditioned, namely, Issues 3 and 4. See Rule 279. The word "suffer" used in said Issue 3 means "to undergo, to experience." The word "result" used in said Issue 3 means, when used as a verb, "to proceed, spring, or arise as a consequence or effect"; and when used as a noun means "that which results, as, a consequence." See Webster's Collegiate Dictionary, 5th Ed. Thus affirmative findings in response to Issues 3 and 4 of the charge, on which Requested Issue 4 was conditioned, that plaintiff "has suffered or will suffer total incapacity to work as a result of injuries, if any, sustained by him on June 9, 1944," and that "such total incapacity is permanent," are substantially equivalent to a finding that plaintiff's injuries of June 9, 1944, were the producing cause of such total permanent incapacity. The trial court's Issues 3 and 4, cast in plain language taken from the common speech, requiring no explanatory definitions, put to the jury the inquiry expressed

in Requested Issue 4. The discussion in Travelers' Insurance Co. v. Johnson, Tex. Civ.App., 84 S.W.2d 354, at pages 358, 359, and Safety Casualty Co. v. Walls, Tex. Civ.App., 117 S.W.2d 879, at page 883, is suggestive.

Under Point 4, defendant assigns error to the refusal of the trial court to submit defendant's requested Issue 6, inquiring whether such personal injuries as plaintiff sustained were accidental injuries.

Issue 1 of the trial court's charge has been quoted; it submitted the question, whether plaintiff "sustained personal injuries on June 9, 1944, as a result of falling from steps." No objection to the form of this Issue is before us.

Defendant's Requested Issue 6 was conditioned upon an affirmative answer to Issue 1 of the charge; it read:

"If you have answered Special Issue No. 1 'Yes' and only in that event, then answer:

"Do you find from a preponderance of the evidence that such personal injuries, if any, were accidental injuries? Answer 'Yes' or 'No.' Answer:

"By the term 'accidental injuries' as used in this issue is meant injuries occurring suddenly and unexpectedly and without foresight or design of the Plaintiff, George N. Foxworth, and traceable to a definite time and place."

■■ Point 4 is overruled. Since Requested Issue 6 was conditioned upon Issue 1 of the trial court's charge, and since no objection to Issue 1 is before us, defendant acquiesced in the submission of Issue 1 to the jury; and the trial court correctly refused to submit Requested Issue 6 because it submitted clearly some matters already inquired about in Issue 1, and, being conditioned upon an affirmative answer to Issue 1, would have required the jury to make a finding respecting matters already determined by them. And none of these overlapping matters were essential elements of the defense of suicide or intentional injury, to which defendant refers in the argument under Point 4. The jury could not have found in response to Issue 1 that plaintiff "sustained personal injuries on June 9, 1944, as a result of falling from

steps" without passing on every element of the definition of *accidental injuries* tendered by defendant as a part of Requested Issue 6 except possibly that element expressed in the words "unexpectedly and without foresight or design of the plaintiff"; and it is our opinion that the language in which Issue 1 was stated put this matter to the jury in a general way. The words "falling from steps" connoted an unintentional act. Richards v. Travelers' Ins. Co., 18 S.D. 287, 100 N.W. 428, 67 L.R.A. 175. If defendant thought this connotation was not expressed in Issue 1 with sufficient force or clarity, or if defendant believed that the evidence tended to show attempted suicide or wilfull injury by the plaintiff, the matter should have been brought to the trial court's attention otherwise than by Requested Issue 6.

Defendant sustained no injury from the refusal to submit Issue 6; there is no evidence in the record that plaintiff attempted to kill or injure himself. The question on the facts was simply whether plaintiff stepped on something as he started down the steps from the "hog" platform, fell over the side of the steps and injured himself against the concrete floor of the basement; and Issue 1 put this question to the jury in terms sufficiently precise in the absence of an appropriate objection or request.

Nothing occurred in the presence of Foster and Isaacs which suggested to them that plaintiff threw himself from the steps. Plaintiff was in their presence some 10 or 15 minutes and comported himself in a normal manner. Foster said: "He just walked up and said a few words about something or other." Isaacs said: "I don't remember what he said; just talking like a friendly talk anywhere as if we would have met him somewhere else."

These witnesses did not see plaintiff fall. As previously stated, they had left the "hog" and were a short distance away when their attention was attracted by the sound of plaintiff's fall. Foster said: "I heard the noise and I looked back and he was laying there on the concrete floor. He was to the right of the steps like. Well, I went to him as quick as I could."

When he reached plaintiff, "I asked him where he was hurt at" but before doing so "I kind of straightened him out a little bit." Plaintiff said his head and neck hurt. Witness and others carried plaintiff out to a car which took him away. Isaacs said he "heard a jar, heard something fall, and turned around and there was him. We heard the sound of it. I didn't see him fall but he did, or I suppose it was him when he hit the floor. When I looked around he was on the floor. I went to him." Plaintiff made no statement; "all we ever got was 'oh, my head and my neck.'" He said that when plaintiff fell, it sounded like a dull thud, like a man's head hitting on something hard. "I asked him a time or two how he felt but he never answered me. He kept saying 'Oh, my head, and oh, my neck,' 'my head and my neck' like that." Like a drunk man drowning. He thought plaintiff was "half out." He saw a skinned place on plaintiff's head. (We note that Foster said he saw blood on plaintiff's head.)

Isaacs' testimony indicates an assumption that plaintiff fell off of the steps—as distinguished from a deliberate act.

There is nothing in the evidence respecting plaintiff's life before June 9, 1944, suggesting any reason for attempted suicide or wilfull injury. Plaintiff had then been in the employ of the Foster Lumber Company for about fifteen years, working at various jobs. He had served as nightwatchman for five years or longer before that date. Testimony as to the work he did before he became a nightwatchman indicates that he was an unskilled workman, but during the year prior to his injury his wages amounted to $1638.64. There is nothing in the record to indicate that his relations with his employer were unpleasant; the inference is otherwise. He worked regularly; Dalton, the mill manager, said that plaintiff made a good hand. Certainly there is nothing here tending to show that plaintiff would willingly substitute for this employment the uncertainties and necessarily reduced income incidental to a workman's compensation claim.

At the time of his injury plaintiff was about 43 years old. He was married; he had been married since 1922, or about 22 years, and had four children, two boys and two girls, aged 20, 18, 15 and 13 years respectively. His oldest boy was in the service. His oldest daughter was married to a young man in the military service, and resided with her parents, as did the other children. Plaintiff seems to have had no serious illness. The melancholia inquired about in Issue 14 of the trial court's charge did not exist, or at least was not shown to have existed before June 9, 1944. In short, plaintiff's life with his family, so far as revealed at all by the record was normal and uninterrupted by any matter sufficient to provoke suicide or wilful injury to his person. Since the incident of June 9, 1944, plaintiff's life has been entirely different. He has not been employed. The jury has found that he was totally and permanently incapacitated to work, and defendant has not attacked these findings.

Under Points 5 to 15 inclusive, defendant assigns error to the trial court's refusal to grant defendant a new trial because of remarks by plaintiff's counsel during argument to the jury. All of these Points are overruled, for reasons hereinafter stated.

Under Point 5, defendant refers to statements to the jury by one of plaintiff's counsel respecting plaintiff's right to go on the "hog" platform when Foster and Isaacs were there, and the effect which a motive personal to plaintiff might have on the existence of such a right. Defendant also refers to remarks of other counsel for plaintiff which were apparently addressed to the trial court in reply to defendant's objections to the jury argument. Point 5 is based on defendant's Bills of Exceptions 1 to 5, inclusive. The question under discussion seems to have been whether plaintiff acted in the course of his employment in going on the platform (submitted in Issue 2 of the charge); and from the matter stressed in defendant's argument under Point 5, it seems to be defendant's position that the remarks of plaintiff's counsel misstated the law of the case and tended to

nullify the defense of deviation by plaintiff from his employment which defendant presented in Requested Issue 6, discussed above under Point 2. Defendant says, in effect, that the remarks of plaintiff's counsel tended to confuse the jury and bring about a finding in disregard of the law that plaintiff went on the platform in the course of his employment although his sole purpose in so doing was to visit his coemployees. Objections by defendant were sustained to most of these remarks; if there was error incidental to said remarks, it was cured at least as regards those statements to which the court sustained objections, and it was harmless as regards the balance of said remarks. The only evidence of plaintiff's motive came from plaintiff himself. If the jury disbelieved plaintiff's testimony, they necessarily turned to consideration of other circumstances in proof, which as we have pointed out above in discussing Point 2 tended to show in a general way that plaintiff was performing his duties as nightwatchman in going on the platform. It is not apparent that the remarks of plaintiff's counsel would have lead the jury into attaching a greater significance to these circumstances than the circumstances deserved, or caused them to give these circumstances an interpretation which the circumstances would not support.

Under Point 6, defendant refers to certain comments respecting defendant's failure to produce one Dr. Leggett on trial as a witness. Point 6 is based on defendant's Bills of Exceptions 6, 7, 17, 18, 19 and 20.

There was testimony tending to prove the following matters: Immediately after plaintiff fell from the steps, he was taken to his home and was there given an examination by Dr. Everitt, who was the mill doctor, employed at a monthly wage by the Foster Lumber Company. Dr. Everitt found a wound on the right side of plaintiff's head, between the eyebrow and the crown of the skull; he concluded that plaintiff should be placed in a hospital and x-rayed, and without further treatment, after an examination lasting only a short time— Mrs. Foxworth testified that plaintiff was at home only 25 or 30 minutes—he despatched plaintiff via ambulance to Dr.

Leggett's hospital at Cleveland, in the adjoining county. This he did on his own initiative; he selected Dr. Leggett and the ambulance as well. Plaintiff was carried to Dr. Leggett's hospital and remained there about two weeks under Dr. Leggett's care. Dr. Everitt saw him once, casually, while he was there. While in Dr. Leggett's hospital, on the day following his injury, an x-ray picture was taken of plaintiff's head. This x-ray was not proven on trial. Cox, the agent of defendant, testified that he talked to Dr. Leggett; and that the film was delivered to him by Dr. Leggett at his, the witness', request ("I told him I wanted to take it out to Houston"); that he, the doctor, and a nurse hunted for this film, and he thought that it was eventually located by Dr. Leggett himself. He testified further that he kept the film for a time and then delivered it to one of defendant's counsel, who had it in his possession on trial and who attempted to introduce it in evidence. The film he tendered seems to have been excluded by the trial court because it was not properly identified; however we have not been able to find any ruling by the court on the admissibility of this film. No assignment respecting such a ruling is before us.

Dr. Leggett did not testify on trial, by deposition or in person.

The jury was informed during trial that defendant's counsel had declined to permit plaintiff's counsel to examine Dr. Leggett's x-ray. The following colloquy occurred between counsel while defendant's counsel was attempting to procure a certain report made to plaintiff's counsel by Dr. Corrigan, a witness:

"(Defendant's counsel) (To plaintiff's counsel): You will not give him permission?

(Plaintiff's counsel): Did you let me have Dr. Leggett's picture? No, sir, we won't, just like you did with Dr. Leggett's x-ray."

No objection was made to these remarks.

In behalf of Foster Lumber Company, Dr. Everitt made out a report of plaintiff's injury and sent it to the Industrial Accident Board, and this report, or most of it, was

proven item by item during Dr. Everitt's examination. The witness had a copy of the instrument in his possession and seems to have used it to refresh his memory. This report identified Dr. Leggett as one of plaintiff's doctors, and described plaintiff's injury as "lacerated wound on scalp with slight fracture of skull over the right eye." Dr. Everitt said that he did not find any fracture of plaintiff's skull and that in his opinion plaintiff's skull was not fractured; he said that his report of a fracture was based on information given him by Dr. Leggett. Defendant objected to proof of this report, but has not assigned error on this appeal to admission of the report in evidence. As a matter of fact counsel for defendant later questioned Dr. Everitt about this matter himself. We note the following, from the witness' deposition:

"Q. Now, was there any other wound you found about his head? A. There was not.

"Q. Now regardless of how you got it—

"(Defendant's counsel): That is not the question.

"Q. (continuing) Did he report 'slight fracture of skull'? A. I really do not remember whether Dr. Leggett told me—I am inclined to believe now that he did not, but the word came back to me here, and I got it in a general way. I do not remember how I got it."

There was other testimony before the jury respecting this report of fracture by Dr. Leggett. Dr. Corrigan, testifying in behalf of plaintiff, said: "One time it seemed he remembered right after he fell and got up, and the other time it seemed like he was not too sure he could remember anything until he found himself in Doctor Leggett's hospital in Cleveland, Texas. And he stated the Doctor told him he had a fractured skull; * * *." Dr. Bartel, testifying in behalf of defendants, said: "Q. What in your opinion caused this condition? A. Well, I believe probably that it is self-pity, or thinking he hasn't been done right, which might have been aggravated by some of his friends and the like; and it seems like some doctor at the very beginning told him he had a fractured skull and he couldn't get that off his mind."

It was thus before the jury, for what it was worth, that Dr. Leggett had found a fracture of plaintiff's skull; and whether rightly so or not, or whether the relevant testimony amounted to competent evidence or not are questions not before us on this appeal. This matter was evidently argued to the jury; and after careful consideration of defendant's brief and the relevant bills of exceptions we have concluded that statements by plaintiff's counsel as to what Dr. Leggett "said" are repetitions of the foregoing, probably of Dr. Everitt's testimony.

Defendant's Point 6 reads:

"Because of the error of the trial court in not granting appellant a new trial because of the improper and prejudicial arguments of Mr. Fox Campbell and Mr. Z. L. Foreman's side bar remarks in charging appellant with having Dr. Leggett of Cleveland, Texas, available as a witness and criticizing it for not producing his testimony."

Point 6 is overruled. The jury could properly infer that a connection of some kind existed between defendant and Dr. Leggett because Dr. Leggett was willing to spend his time searching his x-ray files to locate plaintiff's picture and then to deliver it over to defendant's agent at the latter's request and leave it in his possession. Defendant's agent and counsel had kept the picture, for their own purposes. If defendant could get the film, it is a reasonable inference that defendant could have procured Dr. Leggett's testimony, at least by deposition if not as a witness on trial. Under these circumstances, defendant's failure to procure Dr. Leggett's testimony was a proper subject of comment by plaintiff's counsel under the following holding in Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302, at page 305:

"According to the trial court's certificate in qualifying the bill of exceptions defense counsel referred to the fact that Dr. Saunders was Mrs. Smerke's family physician, had treated her for her injuries after the accident but had not been called as a witness for the plaintiff. We think it was the right of defendants' counsel to call attention of the jury to Dr. Saunders' failure to testify. Conversely, it was clearly the right of plaintiff's counsel to direct the jury's atten-

tion to the fact that defendants also had the right to call him but failed to exercise it."

Certainly plaintiff could have called Dr. Leggett as a witness had he desired, and generally there is no privilege available in this State to exempt a physician from testifying. McCormick & Ray, Sec. 233; 44 Tex.Jur. 1075 (Sec. 153).

Although Dr. Everitt sent plaintiff to Dr. Leggett's hospital himself, the following quotations from the testimony of Cox, defendant's agent, indicates that he classified Drs. Leggett and Everitt with the physicians whom he employed in defendant's behalf, and thus tends to support the inference of a connection between defendant and Dr. Leggett, to which we have just referred:

"Q. Now, after you sent him, in other words, after Dr. Leggett and Doctor Everitt treated this man, the next doctor you sent him to was Doctor Best, the man we just talked about? A. That is right.

"Q. Then that is Doctor Paul Best; that is one doctor? A. That is right.

"Q. Doctor Leggett another, and Doctor Everitt another, and if he went to Harris & Wigby at Doctor Best's request, that is four, and Doctor Bartell is five, if I am telling you right; if that is true? A. I sent him to another doctor.

"Q. With those five? A. Yes, sir."

While Dr. Everitt was the mill doctor, the record shows that various employees of Foster Lumber Company cooperated with Cox, defendant's agent, in having plaintiff examined and treated, and acted in relation to plaintiff's claim for compensation.

The point made in the remarks of plaintiff's counsel had already been forcibly presented to the jury by the testimony. This matter of a fracture or not of plaintiff's skull was an evidentiary matter, indicating only the force of the blow sustained by plaintiff's head when plaintiff fell. X-ray pictures were taken of plaintiff's skull and of other portions of his body on July 6, 1944, less than thirty days after plaintiff fell (on June 9), and on August 21st or 22nd, 1944, and in December, 1944, but none of these films exhibited any fracture; and every doctor who testified on the trial of the case—and there were eight of them—said that he found no fracture of plaintiff's skull. Dr. Leggett was not only the only physician who purportedly discovered such a fracture, but he was also the only physician who treated the plaintiff who did not testify. Thus Dr. Leggett's purported finding was so directly brought to the jury's attention, his absence from the stand was so significant, and his availability to defendants so clearly indicated that the record itself inevitably presented to the jury the subject matter of the remarks of plaintiff's counsel.

Defendant refers to matters in the argument under this point which are not strictly within the terms of said point of error, but whether so or not we attribute no special significance to them.

■ Under Point 7, defendant refers to statements by plaintiff's counsel to the jury, and to the trial court, "charging the (defendant) with having control of and available as witnesses, employees of the Foster Lumber Company and neighbors of (plaintiff) and criticizing (defendant) for not producing them." The argument referred to seems to be that set out in defendant's Bills of Exceptions 9 and 21; and the trial court instructed the jury not to consider these remarks. The argument in Bill 9, that local employees of Foster Lumber Company were available to defendant as witnesses was supported by the record; the testimony showed cooperation between defendant and Foster Lumber Company respecting the subject matter of this suit which raised an inference that defendant would have had the good offices of Foster Lumber Company in procuring testimony from that company's employees, and this, in effect, made said employees substantially as available to defendant as to Foster Lumber Company. The statements of plaintiff's counsel appearing in Bill 21 probably went out of the record as regards defendant's counsel's knowledge of certain matters; but this argument was primarily a eulogy of the plaintiff's truthfulness which the ordinary jury can be trusted to consider objectively. Whatever error was involved in the matters referred to under Point 7 was cured by the trial court's instruction.

Under Point 8, defendant refers to statements of plaintiff's counsel "discussing the testimony of Dr. David with regard to the test he made to determine if (plaintiff) had concussion of the brain." Point 8 is based on defendant's Bill of Exception 8. The argument of plaintiff's counsel was supported by the record, and there was no danger of the jury forgetting that the witness' opinion was based upon numerous other tests, as well as x-rays and observation covering almost three weeks while plaintiff was in a hospital under the treatment of this witness. The remarkable simplicity of the tests referred to in this argument had some logical relation to the spirit of levity which colored the remarks to which defendant here objects.

Under Point 9, defendant refers to statements by plaintiff's counsel "discussing a lump sum recovery and ridiculing Mr. Cox, adjuster for (defendant)." The argument concerning lump sum recovery is set out in defendant's Bill of Exception 10; and the trial court instructed the jury not to consider them. Plaintiff's counsel did not misstate the law on this matter, and we note that plaintiff prayed for a lump sum recovery and for discount thereof consistently with the argument to which defendant objects. Plaintiff states in his brief, without contradiction, that this pleading was read to the jury. It is difficult to see how defendant could have been injured by this argument under these circumstances; but whatever error occurred was cured by the instruction. It is not clear from Point 9 what remarks were referred to as "ridiculing Mr. Cox." Point 9 has been discussed by defendant with several other Points of Error, and in the summary of all these points at the beginning of defendant's discussion there is no reference to such statements. We have finally concluded that defendant probably meant to refer to statements made by plaintiff's counsel, copied in defendant's Bill of Exception 11, describing Mr. Cox as "this bushy headed insurance agent." Since Mr. Cox testified, and since his agency for defendant was proven, this remark could not have injured defendant. There are other statements of plaintiff's counsel in Bill 11 which, in effect, charge that Mr. Cox treated plaintiff un-

fairly in the matter of computing compensation payments made to plaintiff for a short time after plaintiff was injured, and it may be that defendant intended to assign error to these remarks under Point 9. If so, plaintiff's counsel did not go completely out of the record; this matter is discussed under Point 10, immediately following.

Under Point 10, defendant refers to certain remarks "regarding Mr. Dalton's testimony as to a wage statement he sent to T. H. Mastin & Co." Point 10 seems to be based on defendant's Bill of Exception 11 and perhaps on a part of defendant's Bill 12. Plaintiff's counsel in effect said that Mr. Dalton had furnished defendant with the information respecting plaintiff's wage rate which was proven upon trial by a Mr. Jackman, an employee of Foster Lumber Company.

Mr. Jackman's testimony showed how many days plaintiff had worked during the year before he was injured, and the total wages paid plaintiff during that year. His testimony was based on the records of plaintiff's employer, Foster Lumber Company. The parties differed as to how plaintiff's average weekly wage was to be computed from these figures, but according to plaintiff's theory, 60% of said wage was $19.242, and according to defendant's theory, was $18.906. The testimony showed that the payments actually made to plaintiff were lower than either figure. Plaintiff said that defendant paid him compensation for about 12 weeks and that the checks were for approximately $16. Plaintiff's wife said that defendant paid her husband compensation for 12 weeks, or some 10 or 12 weeks, and that the checks averaged $16 a week. Mr. Cox, an agent of defendant's, said that he paid plaintiff compensation for about 12 weeks, and that he figured it around $16 a week. The difference between the payments received by plaintiff and the payments he was entitled to receive was small but probably had a significance to the plaintiff under all the circumstances which would not have been given it by one gainfully employed.

Mr. Dalton was manager of Foster Lumber Company's plant at Fostoria when plaintiff was injured there, and his testi-

mony showed that it was his practice to furnish to defendant a statement setting out the information proven up by Mr. Jackman, and that this statement was prepared in the Foster Lumber Company office, by that company's staff, from that company's records, and was signed by him as manager.

■ Mr. Cox's testimony showed that payments of compensation to plaintiff began 8 days after plaintiff was injured, that is, on or about June 17th; and the testimony of this witness further shows that he received a wage statement covering plaintiff which was dated June 30th and was executed by Mr. Dalton. These circumstances tended in some degree to show that after the $16 payments to plaintiff began, the Foster Lumber Company records were made available to defendant, in the form of a statement by Mr. Dalton whereunder plaintiff was entitled to a larger payment than he actually got; and that defendant made no change in the compensation payments already begun. The inference is not very convincing; Mr. Dalton's statement might well have been erroneous, but the argument of plaintiff's counsel is not completely outside the record, either as regards the remarks referred to in Point 10, or as regards the remarks in Bill 11, referred to at the close of our discussion of Point 9 above, charging Mr. Cox with unfairness in paying plaintiff's compensation. See: Teston v. Root, Tex.Civ.App., 95 S.W.2d 524.

The information actually furnished Mr. Cox in Mr. Dalton's statement of June 30th was available on trial; but was not proven up by either party. Defendant's brief refers to this statement, or so we construe the discussion, as showing "that appellee's weekly compensation rate was $16.02 per week and that based upon this wage rate furnished appellant by the Foster Lumber Company, Mr. Cox as adjuster for the insurance company paid and the appellee accepted $16.02 per week for 12 weeks. Later when Mr. Jackman more carefully checked the records it was found that the weekly compensation rate was greater." We find no basis in the record for these figures. The testimony does show that Mr. Dalton made out another report, apparently a wage report, in November, which was filed with the Industrial Accident Board, but Mr. Cox said he had not seen this.

Under Point 11, defendant refers to the following argument of plaintiff's counsel: "And taking those books and figures, which are according to Mr. Dalton's testimony, the same books, the same figures that were furnished T. H. Mastin & Company, from which Mr. Cox worked and arrived at what they were to pay him; and that testimony was they tried to pay him sixteen dollars a week, and then the last payment, they told him it was a final check according to Mr. Foxworth, for two weeks pay at sixteen dollars a week. It was a final check, and he told him he didn't want it; and Cam you have that check, you said in the presence of the jury you had it."

■ All material elements of this argument were supported by the record except perhaps the concluding statement as to who had possession of the last compensation check, and on this record that is of no special significance. This particular check was tendered plaintiff but was refused by him. Mr. Cox said that this check was returned "to us by the mill." We are inclined to construe the remark of plaintiff's counsel as meaning only that defendant, and not defendant's counsel, had possession of this check; but if this construction is wrong the remark could not have done defendant any injury. As regards other matters stated in the argument referred to under Point 11, the statement regarding books and figures is obviously a repetition of that discussed under Point 10 and was, to some extent, a conclusion from the record. The amount of the checks paid to plaintiff was correctly stated, or stated with substantial accuracy.

■ Under Point 12, defendant refers to statements by plaintiff's counsel "charging the Foster Lumber Company with taking out of the employee's salaries a part of the compensation insurance." Point 12 is based on defendant's Bill of Exception 13. The trial court instructed the jury not to consider these remarks and the error—for counsel went completely out of the record—was cured. The holding is based upon a thorough examination of the record now before us and we desire to state

that we might very well reach a different conclusion on a different record, despite such instructions as the trial court gave.

 Under Point 13, defendant refers to statements by plaintiff's counsel which are construed to be a criticism of defendant's counsel for objecting to the argument being made to the jury. Point 13 is also based on Bill 13. The remarks of plaintiff's counsel were interrupted and are more complaint than criticism. This matter could not have done defendant any harm. We note that the trial court instructed the jury not to consider the statement.

 Under Point 14, defendant refers to remarks of plaintiff's counsel regarding the "fees of Dr. Best, a witness for (defendant), charged (defendant) for cases he had examined and reported on within a twelve months period." Point 14 is based on Defendant's Bills of Exception 14 and 15, and the remarks complained of were out of the record and erroneous for that reason. However, the telling part of this argument, the essence of the point intended to be made by plaintiff's counsel, was before the jury on the facts; and counsel's step outside the record probably did defendant no harm. It was in evidence that Dr. Best examined plaintiff, at defendant's request, on July 6, 1944, some 27 days after plaintiff was injured; and plaintiff remained under Dr. Best's care in a Houston hospital until July 25, 1944. Dr. Best diagnosed plaintiff's injury as a cerebral concussion, and it was his opinion when plaintiff left the hospital that plaintiff should recover in some two or three months. He is not shown to have seen the plaintiff after plaintiff left the hospital on July 25, 1944. At the request of plaintiff's counsel, this witness furnished a list of the names and addresses of persons referred to him by T. H. Mastin & Company (defendant's agents) for examination during the year "Aug. 1944 to Aug. 1945," and this list ran to thirty-two persons. What fees Dr. Best collected for this work were not proven, but the testimony inevitably left in the minds of the jury the conclusion that he was paid for what he did; and this was the forceful part of the subject matter of the remarks to which defendant here objects. For this reason we attach no special significance to the action of the trial court in overruling defendant's objection to the statement of plaintiff's counsel (embodied in Bill 15): "Suppose they paid Doctor Paul Best a reasonable fee for thirty-two patients. You have a right to imagine what you think it was." The supposition invited by plaintiff's counsel would, we think, inevitably be provoked by the evidence; it probably would have been made without the invitation by plaintiff's counsel. On this record, we do not think the argument in Bills 14 and 15 present reversible error. We note that the trial court instructed the jury not to consider the argument quoted in Bill 14. Furthermore, the remarks concern a matter which was evidentiary and largely covered by other and more convincing testimony in defendants' behalf. Plaintiff was examined by Dr. David in August, 1944, and he remained under Dr. David's care in a Houston hospital from August 21 or 22, 1944, to September 7, 1944. Dr. David's diagnosis and observation, being later in time, thus made Dr. Best's testimony to some extent subsidiary.

 Under Point 15, defendant refers to certain remarks of plaintiff's counsel "regarding the testimony of Mr. Cox, a witness for (defendant) in connection with an original letter Dr. Corrigan had shown him in the file." Point 15 is based on defendant's Bill of Exception 16. We have thoroughly examined Mr. Cox's testimony. The evidence given by him supports every material element of the argument referred to here.

Turning to another matter we note that in argument, defendant says that the rule laid down in Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302, 306 (that an accumulation of improper remarks in argument to the jury, to which the trial court sustains objection, may rise to the level of reversible error), should be applied to this case. We have concluded, however, that the rule should not be invoked here. None of the jury's findings have been attacked and the weight of the convincing testimony, reading from the black and white of the statement of facts, is in plaintiff's favor. On the evidence, the real issue between the parties came down to whether

plaintiff's disability was temporary or permanent, and the latest proof, in point of time, on this matter, was offered by plaintiff. Dr. Everitt examined plaintiff briefly on the night of June 9, 1944, and sent him to Dr. Leggett's hospital for examination and treatment. There he remained for some two weeks and then came home. As previously stated, he was examined by Dr. Best at defendant's request on July 6, 1944, and he left that physician's care on July 25, 1944. Dr. Best gave evidence tending to prove that plaintiff's injuries were minor and temporary, but he is not shown to have seen plaintiff after July 25, 1944. Plaintiff remained at home until he was examined by Dr. David, at defendant's request, on August 21 and 22, 1944, and he remained in a hospital under Dr. David's care until September 7, 1944. This physician gave evidence tending to corroborate Dr. Best, and to show that plaintiff was practically well, or seemed so to be, when he left the witness' charge on September 7, 1944. We note that plaintiff contradicted this witness' testimony to some extent. However, plaintiff went back home and was examined by Drs. Corrigan and Bartel in December 1944, and these physicians reported a new development in plaintiff's condition. Dr. Corrigan found extreme nervousness and a mental disturbance in plaintiff and in effect said this could have been caused by plaintiff's fall. He said that plaintiff would break down and cry, and refers to a disturbance of speech. Dr. Bartel found the mental disturbance referred to by Dr. Corrigan, but described it as melancholia, thought it had not been caused by plaintiff's fall, and believed it due to self-pity, aggravated by well meaning friends and information from a doctor, who could only have been Dr. Leggett, that his skull had been fractured. Finally, Dr. Dameron testified, in plaintiff's behalf, that he had first seen and examined plaintiff in the latter part of November or December, 1944, and had seen him four or five times since. He said that plaintiff would break down and cry, was very nervous, had a severe loss of memory, and that plaintiff, in the condition witness found him, could not do manual labor. He said, in effect, that plaintiff's fall could have caused his condition; and gave evidence

supporting the jury's finding that plaintiff's incapacity would be permanent. His diagnosis thus confirms the new development found in plaintiff's case and shows the continuance and progress thereof.

This case went to trial on August 13, 1945, many months after Dr. Bartel saw plaintiff, and he was the last physician who examined plaintiff in defendant's behalf. Plaintiff's wife testified that plaintiff had not worked since his injury, and that she didn't think he weighed over 100 pounds. This last statement is significant; Dr. David, who examined plaintiff on August 21 and 22, 1944, said he then weighed 120 pounds. Plaintiff was a small man and this loss of weight indicates deterioration of plaintiff's condition. Plaintiff's wife said further that plaintiff stays at home; that he lies on the bed all of the time; that he has no appetite; that he complains of his head hurting him, and his back, too; that she gives plaintiff some of Dr. Dameron's medicine "when he is suffering so," and rubs plaintiff's back with "alcohol and black salve" which Dr. Everitt had prescribed; that plaintiff can't sleep until way in the morning sometimes; he just tosses about and sometimes he gets up and goes on the porch and washes his face and dampens his head. He keeps a wet rag on his head. He hasn't any control over his nerves at all. He gets upset about any little thing. In talking to his friends lots of times he would go to crying. He broke down and cried when his deposition was taken, and when two officers of Foster Lumber Company visited him about two weeks previous. He complains of headaches and dizziness. He is not strong as before his injury. He can't remember lots of things. "Lots of times and things he will tell, and then something that happened just a little while before he will forget. He will tell about something and then forget about it. He won't even know he said anything about that certain thing." He doesn't work in the garden (nor do other household chores he formerly did). His head goes to hurting so bad when he gets in the hot sun that he has fits.

Plaintiff testified, and cried while on the stand. Both he and a former neighbor, Mrs. Lollar, gave testimony tending to confirm Mrs. Foxworth's testimony.

■ The written record indicates that plaintiff's condition has become materially and progressively worse since he was last examined by any of the physicians who testified in defendant's behalf. The test to be applied here is that laid down in Rule 434, forbidding reversals for error of law in the course of a trial unless the court shall be of the opinion "that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case"; and it is our conclusion that the verdict of the jury may be laid to the proof introduced by the plaintiff and not to the erroneous arguments of plaintiff's counsel.

This disposes of all Points of error advanced by defendant except Point 16. We have considered Point 16 and overrule it, as being without merit.

Plaintiff has cross assigned error to the trial court's method of computing his average weekly wage. Mr. Jackman, an employee of Foster Lumber Company, testifying from that Company's records, said that plaintiff had worked 294 days during the year preceding his injury, for a total wage of $1638.64. The trial court divided this sum by 52 weeks to determine the average weekly wage, namely, $18.906. Plaintiff argues that he worked substantially the whole of the year if he worked 294 days, and that his average weekly wage should be computed according to the method provided in Subsections 1 and 5 of Section 1 of Article 8309. See: Texas Employers' Ins. Ass'n v. Reed, Tex.Civ.App., 150 S.W. 2d 858, at page 865 (15–17), and Federal Underwriters v. Harwell, Tex.Civ.App., 157 S.W.2d 460. According to plaintiff's method, the average weekly wage was $19.242.

■ No issue respecting the wage rate was submitted to the jury. The matter was left to the trial court; and the only question before us, therefore, is whether the evidence supports the plaintiff's contention as a matter of law. We can not say that it does; the premise of plaintiff's argument is that plaintiff worked 294 days during the year preceding his injury, and the evidence did not prove, as a matter of law, that he worked that number, or any specific number of days.

Mr. Jackman testified in plaintiff's behalf. He was the only person who said that plaintiff worked 294 days during the year preceding his injury; no other person testified that he worked any specific number of days. Plaintiff, however, said that he was off duty nearly a month during this period because of trouble with his feet. He did not remember exactly when this occurred, but thought that it was in February, 1944, or some four or five months before he was injured. Plaintiff's wife said that plaintiff was off duty about a month because of the foot trouble; she was very uncertain as to when this occurred but finally said that it was three or four months before plaintiff was hurt, "or something like that." She said further that when plaintiff returned to duty he worked only three nights a week. Her testimony raises the inference that he had previously worked five, or perhaps six days a week; and we note that when asked whether he worked overtime during the year preceding his injury, plaintiff said: "Yes, sir, up until then I worked 7 days a week twelve hours." Both plaintiff and his wife said that plaintiff worked twelve hours a day, or night; and plaintiff said he worked regularly during this year, except for the time he had trouble with his feet. A calculation based on a liberal application of the testimony of plaintiff and his wife will show that plaintiff worked only 260 or 270 days during the year preceding his injury, or less; and although this testimony is uncertain, it is not wholly consistent with the testimony of Mr. Jackman. It can not, of course, be disregarded.

The record does not show why the trial judge calculated the average weekly wage as he did. At least the evidence does not show as a matter of law that plaintiff worked 294 days during that year, or, indeed, any specific number of days. Plaintiff's cross assignment is accordingly overruled.

This disposes of all matters assigned as error. No error appearing from these assignments, the judgment of the trial court is affirmed.